That is, "[t]he factual part of such instrument [instrument (email) that has never been produced] must contain a statement of the complainant alleging facts of an evidentiary character supporting or tending to support the charges" (CPL 100.15 [3]; 100.40 [1] [a]). *Second*, "the allegations of the factual part [in this case the email] of the information, together with those of any supporting depositions which may accompany it, provide reasonable cause to believe that the defendant committed the offense charged in the accusatory part of the information" (CPL 100.40 [1] [b]). *Finally*, the none-hearsay factual allegations made in the information and supporting depositions must be of an evidentiary character. Which if true, *establish every element of the offense charged and defendant's commission thereof* (CPL 100.15 [3]; 100.40 [1] [c]; see *People v Dumas*, 68 NY2d 729 [1986]); see also [FN1],{**28 Misc. 3d at 486}. In this case the complainant, and SUNY Purchase University Police, intentionally arrange the factual accusatory words of an ABSENT of the main and only accusatory element, the email; to let them appear threatening and ALRMING in nature.

(79) SUNY Purchase University Police, having acted within the law, by following strict NYS CPL's codes and regulations and by not providing the accusatory instrument, [the email] intentionally mislead authorities; thus, allowing them to obtain a warrant for the arrest of the defendant. [Please note that having the defendant arrested and incarcerated with a high bail] thus, defendant would not have the possibility to continue his pending civil right lawsuit in Federal Court. [Please also note that SNUY was aware of defendant's (Plaintiff herein Mr. Morales) low Social Security Disability income of #860.00 and Medicaid recipient status, was no sufficient afford any bail-out].

(80) In determining whether an information is facially sufficient, "[t]he law does not require that the information contain the most precise words or phrases most clearly expressing the charge, only that the crime and the factual basis therefore be sufficiently alleged that a defendant (Plaintiff herein Mr. Morales ) may prepare for trial and avoid retrial for the same offense." (). Where said requirements are met, the People's information *"should be given a fair and not overly restrictive or technical reading." (People v Casey,* 95 NY2d 354, 360 [2000].) *Ultimately*, "[in]n assessing the facial sufficiency of an information, the court must consider whether both the alleged facts and the reasonable inferences to be drawn from those facts, viewed in the light most favorable to the People, would, if true, establish every element of the crime charged" (*People v*

*Barona,* 19 Misc. 3d 1122[A], 2008 NY Slip Op 50814[U], *2 [Cram Ct, NY County 2008]; see also *People v Jennings,* 69 NY2d 103, 114 [1986]; CPL 170.45). In this case the absence of the accusatory instrument (the email) NOT EVERY ELEMENT was available to reasonable to infer a favorable case for the people. In contrast, TODAY, and with this motion, THE COURT CAN, make that inferences and/to dismiss this case.

(90) Furthermore, the Court of Appeals has stated that "paragraphs (b) and (c) of CPL 100.40 (1), read in conjunction, place the burden on the People to make out their *prima facie* case for the offense charged in the text of the information" (*People v Jones,* 9 NY3d 259, 261 [2007]).

(100) Penal Law § 240.30 reads as follows: "§ 240.30.   Aggravated harassment in the second degree "A person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he or she: "1. Either (a) communicates with a person, anonymously or otherwise, by telephone, by telegraph, or by mail, or by transmitting or delivering any other form of written communication, in a manner likely to cause annoyance or alarm; or "(b) causes a communication to be initiated by mechanical or electronic means or otherwise with a person, anonymously or otherwise, by telephone, by telegraph, or by mail, or by transmitting or delivering any other form of written communication, in a manner likely to cause annoyance or alarm; or "2. Makes a telephone call, whether or not a conversation ensues, with no purpose of legitimate communication." [28 Misc. 3d at 488]

(101) Penal Law § 240.30 (1) (a) and (b) only apply to instances where a communication was initiated by the defendant to the complainant, not by returning and email originated by the complainant, suggesting a conductive criticism with a possible scenario who (HE WAS NOT) the perpetrator—negated statement.

(102) Furthermore, defendant's constructive criticism to complainant and possible pressure from SUNY higher officials may have influenced complainant decision to press MISLEADING charges against the defendant by intentionally concealing vital statements.

(103) In addition, the People has ignored the fact that Penal Law § 240.30 (1) (a) and (b) specifically require that the defendant either communicated with the complainant (Penal Law § 240.30 [1] [a]) or caused a communication to be initiated with the complainant (Penal Law § 240.30 [1] [b]).

(104) Penal Law § 240.30 (1) and (2) address two different forms of telephonic harassment.   By its statutory language, Penal Law § 240.30 (1) (a) requires that the defendant "communicates with a person" and paragraph (b) requires that a defendant "causes a communication to be initiated."   In contrast, Penal Law § 240.30 (2) only requires that the defendant "makes a communication, whether or not a conversation ensues."   "A comparison of the two subdivisions makes clear that subdivision (1) contemplates harassment stemming from a communication whereas . . . subdivision (2) contemplates harassment stemming from the act of communicating." see, *People v Shropshire,* 181 Misc. 2d 77, 80 (Cram Ct, Richmond County 1999), quoting

(105) Applying said reasoning, the court in *People v Shropshire* found that Penal Law § 240.30 (1) *"has as a sine qua non a completed phone call in which 'the defendant utter[s] words or otherwise communicate[s] in a manner likely to cause annoyance or alarm.'* "see, *People v Shropshire* at 80, c *Russi and People v Rusciano,* 28 Misc. 3d at 489; 171 Misc. 2d 908 [Just Ct of Town of Eastchester, Westchester County 1997].) Said *"communication" requirement is satisfied by direct communications, messages left on answering machines and/or text messages."* See, *People v Feely*, 23 AD3d 1130 [4th Dept. 2005]; *People v Evans*, 21 Misc. 3d 260 [Crim Ct, Kings County 2008]; *People v Granger*, 19 Misc. 3d 1129[A], 2008 NY Slip Op 50944[U] [Crim Ct, Kings County 2008]; *People v Duran,* 25 Misc. 3d 1210[A], 2009 NY Slip Op 52020[U] [Crim Ct, NY County 2009]; *People v Linage,* 19 Misc. 3d 395 [Crim Ct, Kings County 2008]; *People v Anderson,* NYLJ, June 1, 1989, at 23, col 4 [Crim Ct, Bronx County]).

(106) The court recognizes that although the specific statutory language of Penal Law § 240.30 (1) (a) specifically requires that a defendant "communicate[s] with a person," Penal Law § 240.30 (1) (b) only requires that the defendant "causes a communication to be initiated by mechanical or electronic means or otherwise with a person."   *However*, a review of the legislative intent of Penal Law § 240.30 (1) (b) shows that paragraph (b) was also not intended to apply to an email and/or if the return of an email is considered an initiation of a communication. In the case that the return [reply] of an email may not be cindered an initiation of the communication; thus, wherein the defendant did not make a communication.   In applying this rule, the defendant did initiated the communication when the same night of the allege harassment, he terminated all relation with Mrs. DaGosto.

(107)   In 2001 the Legislature amended Penal Law § 240.30 (1), dividing the statute into subdivision (1), paragraph (a), beginning with the word *"communicates"* and the second paragraph, (b), which begins with the phrase *"causes a communication to be initiated."*   Said amendment was made to

*"Overrule case law* [28 Misc. 3d at 490] . . . which held that subdivision one did not apply where the defendant (although uttering words which were violated of the statute during a telephone conversation) neither initiated the telephone call to the complainant nor caused the complainant to make the call." (*Donning, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 240.30, at 88;* see also **People v Hernandez,** 7 Misc. 3d 857, 859 [Crim Ct, NY County 2005].)

(108) Judges have accustomed to dismissing harassment charges solely because the defendant did not 'initiate' the communication.*" (NY Senate Memo in Support, 2001 McKinney's Session Laws of NY, at 1558, quoted in* **People v Hernandez** *at 859.)*

(109)   There is no indication from the original formulation of the language of Penal Law § 240.30 (1) (b) that the Legislature intended to remove the "communication" element of Penal Law § 240.30 (1).   In the context of telephone calls, a communication "initiated by mechanical or electronic means" still requires that the defendant make an actual communication to the complainant via a completed phone call.   Translating this rational to an email communication; an email that is being replied may not be considered a *"*COMPLETE COMMUNICATION.*"*

(110) *Just as with Penal Law § 240.30, Penal Law § 215.51 (b) has a separate provision criminalizing communications (paragraph [iii]), and a separate provision criminalizing telephone calls, whether or not a conversation ensues. (Paragraph [IV]) In* **People v Calderon** *(173 Misc. 2d 435, 438 [1997]) the Supreme Court for Kings County dismissed an indictment pursuant to Penal Law § 215.51 (b) (iii) stating that "the language of Penal Law § 215.51 (b) (iii) indicates that a person must have 'communicate[d] or cause[d] a communication to be initiated' in order to be guilty of criminal contempt in the first degree.* There is no clause in the statute which, as in Penal Law § 215.51 (b) (IV), prohibits such communication 'whether or not a conversation ensues'. From the evidence adduced before this court it appears that the defendant only replied to an email sent by the complainant on July      10[th], 2013, and that there was other communication related to

any aggressiveness related words from the part of the defendant in the three years complainant and defendant had contact—whether via email and/or in person. Repeated communication may be the basis for charges of aggravated harassment pursuant to Penal Law § 240.30 (1) and (2).

(111) Furthermore, an accusatory instrument alleging repeated harassing annoying and alarming communication can be facially sufficient on a charge of Penal Law § 240.30 (1) if the factual allegations include some description of the defendant's (Plaintiff  herein Mr. Morales ) communication(s) to the complainant during the course of said calls. Said communications can be in the form of direct statements, phone message and/or text messages; see *People v Feely,* 23 AD3d 1130 [4th Dept. 2005]; *People v Evans,* 21 Misc. 3d 260 [Crim Ct, Kings County 2008]); *People v Linage,* 19 Misc. 3d 395 [Crim Ct, Kings County 2008]; *People v Granger,* 19 Misc. 3d 1129[A], 2008 NY Slip Op 50944[U] [Crim Ct, Kings County 2008]; *People v Duran,* 25 Misc. 3d 1210[A], 2009 NY Slip Op 52020[U] [Crim Ct, NY County 2009]).

(112) Furthermore, even if the content of the alleged communications [not one communication] appears innocuous, a violation of Penal Law § 240.30, (1) will occur if the communication was directed to an unwilling listener under circumstances wherein substantial privacy interests are being invaded in an <u>essentially intolerable manner;</u> (see *People v Shropshire,* supra, citing see also *People v Evans,* 21 Misc. 3d 260 [Crim Ct, Kings County 2008], citing *People v Chandler,* 20 Misc. 3d 139[A], 2008 NY Slip Op 51577[U] [ *App Term, 1st Dept. 2008], lv denied 11 NY3d 854 [2008]).* Complainant never attempted to contact defendant to terminate or avoid any further communication with him.   Making it believe that it was not of her displeasure and/or she might even agree to defendant's remarks, and/or just waiting for the right time to stage a hostile communication with defendant.   Alternatively, a SETUP!

(113) a defendant's intent can be inferred from the act itself. The defendant's pattern of conduct and the circumstances surrounding an alleged act. There is no parent of negative, or alarming conduct in this case; defendant parent of conduct was ever so perfect and untouchable by communicating more than 500 times via email successfully, respect and professionalism. (see *People v Bracey,* 41 NY2d 296 [1977]; *People v McGee,* 204 AD2d 353 [2d Dept. 1994], lv denied 84 NY2d 870 [1994]; *People v Turner,* 141 AD2d 878 [2d Dept. 1988], lv denied 72 NY2d 962 [1988]; *People v Chandler,* 20 Misc. 3d 139[A], 2008 NY Slip Op 51577[U] [App Term, 1st Dept. 2008], lv denied 11 NY3d 854 [2008]; *People v Johnson,* 208 AD2d 1051 [1994],

lv denied 85 NY2d 910 [1995]; *People v Rodriguez,* 19 Misc. 3d 830 [Crim Ct, Kings County 2008]).

(114) Therefore, the allegation that a defendant made certain email communication(s) during the course of repeated [SEVERAL emails] made by the WESTCHESTER COUNTY DISTRICT Attorneys' OFFICE sent to the FEDERAL COURT in an opposition statement   are inflammatory and intentionally misleading on its nature.   The nature of the charges are solely based on hearsay and one email that the People did not have and does not want to share with defendant's pro-se status.

(115) the court must evaluate the facial sufficiency of the People's misdemeanor information based upon the factual allegations made therein, and not the factual allegations included in the People's hearsay basis.

(116)It is fundamental that determinations of facial sufficiency are based upon a reading of the accusatory instrument which was never proved by the SUNY Purchase University Police (see *People v Jones*, 9 NY3d 259, 261 [2007]).

(117) For the reasons previously stated, the court must reject the People's arguments, if any, that the misdemeanor information is facially sufficient, on the charges of Penal Law § 240.30 (1) (a) and (b), based solely upon the allegation that the defendant's in three years repeatedly emailed the complainant never causing the her to become alarmed and annoyed. Mrs. DaGosto's complaint was purely retaliatory in nature, against the law and subject to prosecution.

(118) as stated, charges under Penal Law § 240.30 (1) (a) and (b) require an allegation that the defendant made some communication(s). The only communication alleged in the misdemeanor complaint occurred on July 10th 2013, at approximately 09:15 p.m., wherein the defendant stated a comment[s] and suggestive idea in which he would not be a part of it.   The People acted on behalf of the schools advice without knowing the real intentions of the school officials; just to jail defendants to avoid the continuance of the legal civil proceedings in federal court, thus avoiding their implication on the violation of civil rights against the defendant student. It is unclear at this time, up to what extent, SUNY Purchase University Police cooperated on the coercion—if any—and stage of the charges against defendants.

(119) to determine whether the misdemeanor information is facially sufficient as to the charges of Penal Law § 240.30 (1) (a) and (b), this court <u>MUST</u> evaluate the defendant's alleged email communication in the context of the facts [THE ENTIRE REPLY EMAIL COMMUNICATION] not just the arranged part of it. The court also MUST look into the alleged misdemeanor information to determine whether said replay email communication constituted a genuine threat and/or that defendant's communication was made to an unwilling listener, whose substantial privacy interests were being invaded in an essentially intolerable manner. [28 Misc. 3d at 495].

(120) the factual allegations in the misdemeanor information in this case are facially insufficient to show that the defendant's reply email communication to the complainant constitutes a genuine threat. Mindful of protecting the constitutional right to freedom of speech guaranteed by the Federal and State Constitutions.    Courts of this state have upheld Penal Law § 240.30 to the extent that it proscribes conduct, either speech constituting a *genuine* threat or telephonic/email communication which infringes on a recognized privacy interest.    (See *People v little*, 14 Misc. 3d 70, 72 [App Term, 2d & 11th Jud Dist. 2006], lv denied 8 NY3d 924 [2007]; see also *People vs. Goldstein,* 196 Misc. 2d 741, 745 [App Term, 2d Dept. 2003]).

(121) the information need not allege that the defendant replay email communicated a physical threat to the complainant to be facially sufficient on the charge of Penal Law § 240.30 (1). *"The gravamen of the crimes of aggravated harassment in the second degree is the invasion of someone's private space via specified methods, most notably the electronic communication, and doing so with the intent to annoy, harass, or alarm."*   See ( *People v Taylor,* 19 Misc. 3d 1114[A], 2008 NY Slip Op 50686[U], [Crim Ct, Kings County 2008],    citing *People v Coyle,* 186 Misc. 2d 772 [Nassau Dist. Ct 2000];    *People v Hernandez,* 7 Misc. 3d 857 [Crim Ct, NY County 2005];    *People v Bonitto,* 4 Misc. 3d 386 [Crim Ct, NY County 2004]; see also *People v Goldstein,* 196 Misc. 2d at 747;    *People v Limage,* 19 Misc. 3d 395, 397 [Crim Ct, Kings County 2008].)

(122) both subdivisions (1) and (2) of the statute *"require a showing of defendant's intent to 'harass, annoy, threaten or alarm, thus, they exclude from the statute's <u>ambit speech</u> which is merely unpleasant to the recipient."* See *People v Goldstein,* 196 Misc. 2d at 747; see also *People v Mitchell,* 24 Misc. 3d 1249[A], 2009 NY Slip Op 51931[U] [Sup Ct, Bronx County 2009];

*People v Evans,* 21 Misc. 3d 260, 263 [Crim Ct, Kings County 2008].)

"*A genuine threat is one that is serious, should reasonably have been taken to be serious, or was confirmed by other words or conduct.*" See (***People v Hernandez,*** 7 Misc. 3d at 860, citing ***People v Dietze,*** 75 NY2d 47 [1989].)

(123) "*True "threats encompass those statements where the speaker—communicator-- means to communicate a serious expression of intent to commit an unlawful act of violence to a particular individual or group of individuals*" and it must be shown that "*an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury.*" See (***People v Mitchell,*** 24 Misc. 3d 1249[A], 2009 NY Slip Op 51931[U], *3 [Sup Ct, Bronx County 2009], quoting ***People v***{**28 Misc. 3d at 496} Olivio, 6 Misc. 3d 1034[A], 2005 NY Slip Op 50300[U] [Crim Ct, NY County 2005]; ***Virginia v Black,*** 538 US 343, 359 [2003]; see also ***People v Bonitto,*** 4 Misc. 3d 386 [***Crim Ct, NY County*** 2004]).

(124) Whether or not the defendant's reply[d] email communication to the complainant was a "*true threat*" rather than speech protected by the First Amendment is a threshold question of law for the court to determine.   Said threshold question is different from the issue of whether a reasonable person would interpret the communication as a threat, which is to be determined by the jury at trial.   See (***People v Behlin,*** 21 Misc. 3d 338 [Crim Ct, Kings County 2008], citing see also ***People v Taylor,*** 19 Misc. 3d 1114[A], 2008 NY Slip Op 50686[U] [Crim Ct, Kings County 2008]; ***People v Bonitto,*** 4 Misc. 3d 386 [Crim Ct, NY County 2004].)

(125) the factual allegations in the misdemeanor information are also facially insufficient to show that the defendant's reply email communication was made to an unwilling reader. Where the reader has the opportunity to reject and not open the email; or that the complainant's substantial privacy interests are being invaded in an essentially intolerable manner...this last cannot be implied sine the email account was not her private account and defendant's email account was not that of SUNY Purchase College, as to imply "school setting".

(126) as previously stated, to be facially sufficient on the charge of Penal Law § 240.30 (2), the misdemeanor information must allege facts to show that the defendant lacked any legitimate purpose in emailing the complainant.   Defendant (Plaintiff herein Mr. Morales) has legitimacy purpose to contact the complainer since Mrs. DaGosto was her hired adviser, and

Defendant was a paying customer.   The school setting is also business setting subject to business laws.

<u>Clear and Present Danger.</u>

(127) State and Federal courts at nearly every level of our legal system have held that this provision cannot apply where the defendant's written comments do not pose a *"clear and present danger"* to the imminent risk of harm, impinge upon substantial privacy interests or constitute "fighting words" as defined by the U.S. Supreme Court.   Defendant's arrest violates the First Amendment to the State and Federal Constitutions. Please note defendant was residing at A SUNY campus at a 250 miles away [not *a clear and present* students of Purchase College]

(128) The First Amendment forbids the silencing of speech merely because it is objectionable or offensive to the listener. ***Texas v. Johnson***, 491 US 397, 414 (1989).   Only *"well-defined and narrowly limited classes ... including the lewd and obscene, the profane, the libelous, and the insulting or fighting words ... which by their very utterance inflict injury or tend to incite an immediate breach of the peace"* may properly be proscribed. ***Chaplinsky v. New Hampshire***, 315 US 568, 571-572 (1942).   As the Court of Appeals reiterated in ***People v. Dietze***, 75 N.Y.2d 47 (1989), speech alone may neither be forbidden nor penalized *"unless [it] presents a clear and present danger of some serious substantive evil." Id. at 51.*

(129)   ***People v. Dietze***, emphasizes that prosecutions under §240.30(1) *"must be sharply limited to words which, by their utterance alone, inflict injury or tend naturally to evoke immediate violence or other breach of the peace." Id. at 52.* This includes *"fighting words"* or *"verbally inciting a riot in disregard of police orders to desist."* Id. (citations omitted).   In contrast, *"[t]he fact that certain modes of expression may be 'annoying' to others does not require an individual to forfeit his rights under the First Amendment to make those expressions."* Examining defendants entire reply email to Mrs. DaGosto, it is clear that defendant's statements are protected by the US Constitutional and the NYS Constitution; moreover, that the charges are not truthful, retaliatory, and inflammatory towards defendant.

(130) In ***People v. Dupont***, 107 A.D.2d 247, 255-56 (1st Dept. 1985).   See also, ***People v. Behlin***, 21 Misc.3d 338, 340-41, 863 N.Y.S.2d 362 (Crim. Ct. Kings Co. 2008) (*"because of the*

risk that a statute proscribing communication might infringe on constitutionally protected speech. Penal Law § 240.30 has been strictly construed to reach only conduct intended to threaten or harass, such as threats which are unequivocal and specific, and communications which are directed to an unwilling recipient under circumstances wherein 'substantial privacy interests are being invaded in an essentially intolerable manner'") *(citations omitted)*.

(131) In ***People v. Mangano***, 100 N.Y.2d 569, 764 N.Y.S.2d 379 (2003), the defendant was charged under P.L. § 240.30(1) after he left five telephone messages (an electronic communication) on the Village of Ossining Parking Violations Bureau's answering machine. Id. at 570. *"After mentioning license plate numbers and vehicles, defendant rained invective on two village employees, wished them and their families ill health, and complained of their job performance, as well as tickets that she had received."*

(132) The Court of Appeals held that the statute was unconstitutional as applied to defendant. *"Defendant's messages were crude and offensive but made in the context of complaining about government actions, on a telephone answering machine set up for the purpose (among others) of receiving complaints from the public."*

(133) The Court of Appeals held that defendant's speech did not *"fall within any of the proscribable classes of speech or conduct."*   The Court of Appeals' ruling in *Mangano* was foreshadowed by the Appellate Division's ruling in ***People v. Dupont,*** 107 A.D.2d 247, 486 N.Y.S.2d 169 (1st Dept. 1985).   The Court in ***Dupont*** held that § 240.30 did not prohibit defendant from distributing written materials intended to embarrass his former attorney by exposing *"the attorney's homosexual lifestyle."*

(134) the *"pejorative"* and *"uncomplimentary"* materials were distributed in the attorney's community. The Court stated, *"Throughout the history of the harassment statute in its various forms running back more than a century, it has not been applied to make the mere distribution of printed material a crime."* Unlike cases in which defendants were properly convicted under the statute, *"there is no direct communication, there is no interference with privacy, nor is there a use or tying up of phone lines. There is merely the distribution of literature, offensive though it may be. Such conduct is plainly not within the 'hard core' of the statute's proscriptions."* Id. at 252. After

raising questions about the *"vagueness"* of the statute and its potential to chill others from engaging in protected speech, citing Supreme Court authority, the Appellate Division noted that the written dissemination of foul language, by itself, does not violate the statute. The Court reasoned, while it is true that not every resort to epithet or personal abuse will be viewed as a communication safeguarded by the Constitution (*Cantwell v. Connecticut*, 310 U.S. 296, 309-310 (1940), the "fighting words" exception set forth in *Chaplinsky* will only apply where the expression of ideas was accomplished in a manner likely to cause a breach of the peace (*Cohen v. California*, 403 U.S. 15, 20 (1971). Even if the material in the magazine was provocative, that would not render its distribution the equivalent of *"fighting words"* so as to except such activity from the protection of the 1stAmendment. Defendant's reply email was neither violent nor a potentially violent.   However, defendant statement was a WARNING that a potentially violent act, based on the abusive and discriminatory actions from the pert of school officials (e.g. complainant) against the student body, may one day take place. However, NOT by HIM, or as stated on the defendant's reply email ["NOT ME"].

(135) Building upon the holding in *Dupont*, the New York Court of Appeals held four years later in *People v. Dietze*, 75 N.Y.2d 47 (1989), that a comparable statute was unconstitutionally, overbroad in violation of the First Amendment. That case arose under P.L. § 240.25(2), which, like § 240.30(1), prohibited abusive communications with intent to "harass" or "annoy." Id. at 50-51.

(136) the defendant on a replay email school officials a *""educated gang" in off school setting, naturally it does not evoke immediate violence or other breach of the peace."*   (Citing, inter alia, *Terminiello v. Chicago*, 337 U.S. 1, 4-5 (1949). The Court of Appeals reversed the conviction under § 240.25(1), holding that *"there is nothing in the record demonstrating that defendant's statement that she would 'beat the crap out of [complainant] some day or night in the street' was either serious, should reasonably have been taken to be serious, or was confirmed by other words or acts showing that it was anything more than a crude outburst."*   More broadly, the *Dietze* Court struck down § 240.25(2) as unconstitutionally overboard because its language, *"'abusive or obscene language' and 'intent to harass [or] annoy – simply does not even suggest a limitation to violence-provoking or substantial injury-inflicting utterances.* Indeed, in striking

down this statute as unconstitutional, the Court expressed dismay that its *"past decisions under § 240.25(2), overturning convictions for mere vulgar speech on the ground that such expression did not come within the meaning of the statute ... have not succeeded in halting the prosecution there under of protected expression."* see, (***People v. Carvelas,*** 35 N.Y.2d 803 (1974); ***People v. Collins,*** 31 N.Y.2d 878 (1972); (" In case after case arising under Penal Law § 240.25 (2), we have held that the statute, despite its broad language, did not apply to language and gestures that can only be described as *'abusive or obscene,'* but which are nonetheless constitutionally protected (see, e.g., ***People v. Bacon,*** 37 N.Y.2d 830 (1975) ("go fuck yourself"); People v. Sickles, 35 N.Y.2d 792 (1974) (defendant gave "the finger"); defendant called police officer a "fucking liar"); ***People v. Shaheen,*** 32 N.Y.2d 675 (1973) ("fuck you" and "son of a bitch"); ***People v. Collins***, 31 N.Y.2d 878 (1972) ("all you fucking cops are no good"))}.

(137)   Furthermore; for <u>First Amendment</u> purposes federal courts have, hold that qualified immunity (for state actor Danielle DaGosto) is inapplicable if off-campus speech (plaintiff only address and permanent home is off-campus), would not merit punishment had it occurred on-campus, as school officials should reasonably know that such speech is protected and any punishment would violate the <u>First Amendment rights of the student</u>.   *See Evans v. Bayer,* 2010 WL 521119 (S.D.Fla. 2010).   Furthermore, for the communication in question (the email by plaintiff); the email was sent from Binghamton, at home, on a personal computer and from a personal email account. These facts further protect plaintiff "speech" constitutional rights.

<u>The Federal courts have also reviewed the constitutionality of prosecutions under P.L. § 240.30(1).</u>

(138)   for conduct that does not inflict injury or incite an immediate breach of the peace. In ***Schlagler v. Phillips,*** 985 F. Supp. 419 (S.D.N.Y. 1997), Judge Brieant stated that *"Penal Law § 240.30(1) is over broad as well as vague.   It is unclear what type of communication would be considered to be initiated 'in a manner likely to cause annoyance or alarm' to another person... The statute in this case is utterly repugnant to the First Amendment of the United States Constitution.* "Judge Scheindlin also addressed the scope of § 240.30(1), *"noting that the law could not be applied to a defendant who sent alarming but non-threatening religious literature to a political candidate who found it "alarming and/or annoying."* *Vives v. City of New York,* 305

F.6Supp.    2d 289 (S.D.N.Y. 2003),

(139) Like the State courts that held that § 240.30(1) could not be applied to defendants whose communications merely alarmed or annoyed without creating a clear and present danger, citing settled Supreme Court authority, Judge Scheindlin stated that *"[a] state may punish words 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace; both 'fighting words' – words that are likely to provoke a violent reaction when heard by an ordinary citizen – and 'true threats' may be proscribed without offending the First Amendment. 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."* Id. at 298 (citations omitted).

(140) Judge Scheindlin next reviewed the history of § 240.30(1)'s enforcement, noting that *"for nearly half of its thirty-eight year history, the statute's constitutionality has been questioned."* Referencing the Appellate Division's analysis in *Dupont*, the *Vives* Court added, *"[t]his rather dubious history raises questions regarding why state and local police officers and prosecutors have continued to arrest and prosecute persons for intentionally communicating in a manner likely to 'annoy' or 'alarm.' Though § 240.30(1) has never before been declared unconstitutional on its face, its fate has been foreshadowed since 1985."* The *Vives* Court concluded that the statute *"is unconstitutional to the extent it prohibits communications, made with the intent to annoy or alarm."* Id. The plaintiff's arrest in *Vives* was therefore improper.

(141)While the Court of Appeals in *Vives* reversed Judge Scheindlin's ruling on other grounds– the defendant officers were entitled to qualified immunity on any damages claims – in his partial dissent, Judge Cardamone aptly summarized the state of the law governing the arrest of persons who annoy or alarm others: Speech of this sort may only be proscribed in three very limited circumstances: (1) the speech constitutes *"fighting words"* that "by their very    utterance inflict injury or tend to incite an immediate breach of the peace,"

*Chaplinsky v. New Hampshire,* 315 U.S. 568, 572 (1942); (2) the speech constitutes *"advocacy [that] is directed to inciting or producing imminent lawless action and is likely to incite or produce such action,"* *Brandenburg vs. Ohio,* 395 U.S. 444, 447 (1969); and (3) the speech

constitutes a *"truethreat"* by which *"the speaker means to communicate a serious expression ofan intent to commit an act of unlawful violence to a particular individual or group of individuals."* ***Virginia v. Black,*** 538 U.S. 343, 359 (2003) (quoting ***Watts v. United States,*** 394 U.S. 705, 708 (1969)).

(142) ***Vives,*** 405 F.3d at 123-24 (Cardamone, J., dissenting in part).    Defendant Morales did not violate § 240.30(1), and the available accusatory instrument does not establish otherwise an intention or a remote indication of a possible violent behavior from the part of defendant. Furthermore, Defendant Mr. Morales did not threaten anyone when he sent a reply email to complainant.    There was no "clear, unambiguous, and immediate" threat in writing hypothetical scenarios where defendant has/was actually and textually excluded.

(143) *"True threats"* only include *"statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."* ***Virginia v. Black,*** 538 U.S. 343, 359 (2003). Compare, ***People v. Yablov,*** 183 Misc.2d 880, 883, 706 N.Y.S.2d 591 (Crim. Ct. N.Y. County 2000) (complaint alleging that defendant left angry messages on her ex-boyfriend's answering machine, including the statement *"we'll get you,"* and called him 22 times in a period of 12 hours was insufficient to establish harassment or aggravated harassment where the defendant made no specific threat) with ***People v. Limage,*** 19 Misc.3d 395, 851 N.Y.S.2d 852 (Crim. Ct. Kings County 2008) (complaint alleging that defendant sent six threatening text messages to complainant's phone in less than 17 hours stating that he was "Outside of her residence and that she would end up in the hospital was facially sufficient), as example, it cannot be applied to Mr. Morales case"!!!

(144) FOR THE COUR REFFERENCE...A recent Southern District ruling further confirms that defendant Mr. Morale's **crude but supposing-hypothetical reply emailed message** was not actionable as a *"true threat."* For example, in ***Holley v. County of Orange,*** 625 F. Supp. 2d 131 (S.D.N.Y. 2009), the angry plaintiff sent a bouquet of dead flowers to her son's probation officer with a note that stated, *"Thinking of you – Your 'HELP' will long be remembered."* The plaintiff was charged with aggravated harassment. Judge Eginton granted the plaintiff's motion for summary judgment on liability on her false arrest claim, reasoning that the flowers and note were not a *"true threat."* Rather, *"plaintiff's* bouquet and note were criticisms of the Probation

Department's role in her son's conviction. Her message was delivered via a 'very crude offensive method' that was the result of poor judgment. Plaintiff's actions, however, do not rise to the level of a true threat. The evidence supports the view that the bouquet and card were not serious expressions of an intent to commit unlawful violence against the recipient. They were neither unequivocal nor unconditional insofar as plaintiff expressed her dismay with the Department of Probation and asked for an apology." see, *Watts v. United States*, 394 U.S. 707, 708 (1969)).

(145) that defendant directed vulgarities *"educated gang"* at the complainant also fails to make out a charge under § 240.30(1). In *People v. Livio*, 187 Misc. 2d 302, 725 N.Y.S.2d 785 (Nassau Co. Dist. Ct.2000), the Court held that "the words 'dumb nigger,' though reprehensible, improper and uncalled for, do not rise to the level of aggravated harassment as defined by Penal Law § 240.30 (1). ...Defendant's statement contained no threats, nor invaded complaints privacy in an intolerable manner. The comment made by the defendant to the complainants, although offensive and uncalled for, is a mere opinion which is not *'likely to cause annoyance or alarm'* within the meaning of the statute." Id. at 303, 307. The Court added, *"Rude and angry words are not enough to constitute aggravated harassment. Not every scurrilous or unsavory communication concerning an individual, no matter how repulsive or in what degree of poor taste, necessarily constitutes criminally harassing conduct. Words must be legally obscene or 'fighting words' in order to be exempt from the category of protected speech."* Id. at 307-08 (citing *People v. Dupont*; *People v. Morgenstern*, 140 Misc. 2d 861 (Rochester City Ct. 1988)). See also, *People v. Tirado*, 26 N.Y.2d 325, 330, 310 N.Y.S.2d 303 (1970) (conviction under P.L. § 240.25(1) reversed where "the only evidence in the case bearing upon this charge was the police officer's testimony that the appellant stated, 'I'll get you for this' while seated in a patrol car after his arrest for disorderly conduct.

(146) this single, equivocal statement does not suffice to establish beyond a reasonable doubt that the defendant was with intent to harass, annoy or alarm' the complainant. Something more must be established than that a partially permanent disabled person, upset or annoyed at being abused. Furthermore, the complainant knew defendant's civil rights were being violated for so long; however, she did nothing about it. Defendant had sufficient grounds, expressed his

anger or annoyance in terms of apparent bravado, particularly in the absence of proof of any further words or acts tending to confirm the criminal nature of the act charged.

(147) Nor did defendant Mr. Morales invaded any substantial privacy rights. He did not contact any public officials at home. In *People v. Shack,* 86 N.Y.2d 529 (1995), the Court of Appeals stated, *"an individual's right to communicate must be balanced against the recipient's right 'to be let alone' in places in which the latter possesses a right of privacy, or places where it is impractical for an unwilling listener to avoid exposure to the objectionable communication. ... As the Rowan Court noted in regulating unwanted mail, permitting communications to be foisted upon an unwilling recipient in a private place would be tantamount to licensing a form of trespass, and thus 'a mailer's right to communicate must stop at the mailbox of an unreceptive addressee.' ...   Manifestly, an individual has a substantial privacy interest in his or her telephone; in the context of a telephone (or any electronic communication) harassment statute, the device is easily conceptualized as the functional equivalent of the mailbox."*

(148) Thus, to the extent Penal Law § 240.30 (2) limits a caller's right to free speech, it permissibly subordinates that right to the recipient's right to be free of unwanted telephone calls." Id. at 536 (quoting Rowan v. Post Office, 397 U.S. 728, 736-37 (1970) (emphasis supplied).

(149) Moreover, while individuals enjoy a zone of privacy at home, there is no corresponding privacy right in a government office. In *People v. Henderson,* 177 Misc. . . .2d 672, 677 N.Y.S.2d 669 (Briarcliff Manor Justice Ct. 1998), the Court held that § 240.30(1) was not unconstitutional as applied to defendant who mailed a letter to an elected official at his residence containing profane, inflammatory and threatening language, including threats to kill, although defendant contended that

She was simply voicing her objection to position taken by elected official.

(150) In contrast, in *People v. Behlin,* 21 Misc. 3d 338 (Crim. Ct. Kings Co. 2008), the defendant was charged with violating §240.30(1) for telling a school principal over the phone that she had better *"watch it"* and that he was going to *"get"* her after the principal told the caller that his son was suspended. Id. at 339. In dismissing the charges, the court reasoned: *Firstly,* our complainant telephoned defendant in her official capacity as school principal, and therefore her privacy rights are not implicated. *Secondly,* defendant in no way solicited the call from the

principal. *Thirdly*, as discussed in detail above, Ms. Reyes was not subjected to any *"threats of violence"* during the telephone conversation. *Finally*, defendant's (Plaintiff herein Mr. Morales) response while perhaps rude, is hardly shocking, and certainly should not have alarmed an experienced school principal.    Common sense tells us that the defendant's alleged outburst was not the first, and will likely may not be the last, since the persecution and the violation of his civil rights continue. Furthermore, defendant is likely to react sharply to being told that his right to education is terminated or suspended.    A school principal or adviser, like many other public servants, is required to accept a certain amount of rudeness from the public, without turning her displeasure into a criminal case. Id. at 343.

(151) In sum, defendant Mr. Morales reply email communication was first, a constructive criticism to a failing school official that was covering-up other school's official violation of civil rights falls—Mrs.    DaGosto. Second, defendant made a supposition based on the abusive and discriminatory action of school official's against the students and defendant. The accusation brought by the People's charges fall outside the scope of §240.30; (1). He threatened no one. Nor did he invade anyone's substantial privacy rights. He did not direct any *"fighting words"* at anyone. He did not create a *"clear and present danger"* of any disruption. While defendant's written comment was offensive, it was directed to public office.

True Threats.

(152) Where plaintiff sent an email-- that was mailed to this court and the Harrison court by plaintiff about two months ago--to Defendant DaGosto.(see cause of action #    .) who as retaliatory action pressed charges against plaintiff, for her implication of providing discriminating FREE hosing in exchange of summer work, to students with permanent address of only five miles from work...Referring to the email sent to said defendant...(Plaintiff    herein Mr. Morales ) Freedom of speech was guaranteed in the First Amendment so that a full range of ideas would be available on matters of public interest, where the public interest of plaintiff was make school official and state actor, aware that their abusive behavior could cause a tragedy in the future, by giving a supposition    and an example. The Supreme Court's interpretation of the First Amendment as it pertains to public college campuses over the past 80-90 years is derived in part from J.S. Mill's essay, "On Liberty," in which he asserted that:

"… *The peculiar evil of silencing the expression of an opinion is, that it is robbing the human race; posterity as well as the existing generation; those who dissent from the opinion, still more than those who hold it. If the opinion is right, they are deprived of the opportunity of exchanging error for truth: if wrong, they lose, what is almost as great a benefit, the clearer perception and livelier impression of truth, produced by its collision with error.*"

Referring to Mrs. DaGosto's' retaliatory action; the federal court's <u>jurisprudence on "true threats"</u> "*College administrators are often **too** willing to punish constitutionally protected speech under the rationale of addressing and preventing threats, intimidation, and violence.*"

(153)The Supreme Court directly addressed what constitutes a true threat in ***Virginia v. Black,*** 538 U.S. 343 (2003). In *Black* is an important decision providing much-needed guidance in this area of the law, but, federal courts have determined that in order for speech to constitute a true threat, the speaker must intend to threaten someone. This doesn't mean that the speaker must actually intend to carry out the threat. It does mean, however, that the speaker must subjectively intend that his or her comments be interpreted as a true threat. In another approach, federal courts h courts do not require that it be proven that the speaker subjectively intended to threaten someone. Rather, they focus on whether there was an intent to communicate and whether an objective or reasonable recipient would regard it as a serious expression of harm...Examples of both approaches: the Ninth Circuit applied the subjective intent test in *United States v. Cassel,* 408 F.3d 622 (9th Cir. 2005)., whereas the Fifth Circuit applied the objective recipient test in <u>Unfortunately, college administrators have demonstrated a propensity to censor and punish much</u> <u>student expression under the rubric of true threats and intimidation, when the speech involved in</u> <u>fact does not come close to qualifying under *either* the subjective or objective test. Under both</u> <u>tests—which concern the intent of the speaker—a statement must be understood by a reasonable</u> <u>person as expressing intent to commit unlawful violence in order to qualify as a true threat. Even</u> <u>if a person sincerely believes he or she is being threatened, if that belief is unreasonable, the</u> <u>statement is not, constitutionally speaking, a threat. Yet colleges and universities have taken the</u> <u>exact opposite approach. *The Wall Street Journal* recently reported on this continuing problem,</u> <u>quoting FIRE President Greg Lukianoff:</u>

*"Right now, if a university administrator claims that someone is a threat, even if that threat is virtually unsupportable and completely unreasonable, they have carte blanche to do what they want,"* says Greg Lukianoff, president of the Foundation for Individual Rights in Education.

(154) there has been several instances in which administrators or state actors abused the rationale of preventing threats, intimidation, and violence. At Valdosta State University (VSU), student T. Hayden Barnes was expelled for peacefully protesting the school's decision to construct parking garages on campus. Barnes's protest took the form of an innocuous cut-and-paste collage on the website Facebook.com, yet somehow VSU President Ronald M. Zaccari construed it as Barnes presenting a *"clear and present danger"* to both Zaccari himself and to the campus as a whole.

(155) At Colorado College (CC), meanwhile, two students were found to have violated the school's conduct code regarding "violence" after they published a satirical flyer. The flyer parodied another campus publication and included references to *"chainsaw etiquette,"* the shooting range of a sniper rifle, a quotation regarding a sexual position from the website mens-health.com, and a quotation about "female violence and abuse" of men from the website battered-men.com. According to CC, this "juxtaposition of weaponry and sexuality" in an anonymous parody made other students subjectively feel threatened, leading to CC's finding on the "violence" charge.

(156) Finally, Troy Scheffler, a student at Hamline University, was placed on immediate suspension for opining, in two private emails, that upholding concealed carry rights on campus would prevent school shootings. Not only did Hamline determine that Scheffler posed a threat to the campus community on the basis of these opinions, it did so without affording him any type of hearing. Moreover, it stipulated that he could not return to school unless he submitted to a "mental health evaluation."

(157) In an important decision striking down parts of San Francisco State University SFSU's unconstitutional speech code, U.S. Magistrate Judge Wayne Brazil declined to enjoin the enforcement of another provision prohibiting *"conduct that threatens or endangers the health or safety of any person within or related to the University community, including physical abuse,*

threats, intimidation, harassment, or sexual misconduct." He did so only under the understanding that "the structure of the challenged provision, viewed as a whole, suggests that it was not intended to proscribe 'intimidating or 'harassment' in whatever form 'intimidating or 'harassment' might take, but only the sub-category of intimidation or harassment that 'threatens or endangers the health or safety of any person.'" Significantly, this meant that the provision could not be applied against a student who merely engages in expressive behavior with no intent to threaten or endanger the health or safety of another person. This represents an appropriately narrow approach to the issue, one that colleges and universities would be wise to follow.

(158) Federal courts consider a series of factors in determining whether speech constitutes a true threat, including (1) the reaction of the recipient of the speech; (2) whether the threat was conditional; (3) whether the speaker communicated the speech directly to the recipient; (4) whether the speaker had made similar statements in the past; and (5) whether the recipient had reason to believe the speaker could engage in violence. See *Jones v. State of Arkansas*, 64 S.W.3d 728, 735 (Ark. 2002) (determining that a student giving his rap song threatening violence to another student was a true threat).

(159) Defendant (Plaintiff herein Mr. Morales) has NO history of violence and/or threatening any at Purchase College; But the accuser Mrs. DaGosto was named as defendant in this federal action; thus, as applying the Louisiana Supreme Court, for example, ruled that "a student could face criminal charges for saying that it would be easy to shoot students he didn't like and that **he** was going to blow up the school;" State ex rel. R.T., 781 So.2d 1239 (La. 2001). The state high court noted that the student made the comments only five days after the Columbine tragedy, and emphasized "*the climate of fear already surrounding the school.* "This climate of fear was created by the Schools guilt (including Mrs. DaGosto) for ALL the harm caused for so long from the state actors to plaintiff. If any climate of fear, it was not created by plaintiff, but among the state actors them--self.

(160) Furthermore, a California appeals court recently ruled that a student could not be criminally charged under an anti-threat law for turning in a painting depicting extreme violence against a peace officer who, a month earlier, had cited the student for drug possession. In re Ryan D., Case No. C035092, 2002 Cal. App. LEXIS 4453 .Many cases regarding true threats made by

students are just now circulating through the state and federal courts. Consequently, school officials are advised to seek legal counsel in this evolving area of the law. It is unclear in this case, if Mrs. DaGosto seek legal advised at the time of judging if plaintiff was true threat to her or to the school. Giving the facts stated at the Motion to dismiss file with the Town of Harrison Court, Mrs. DaGosto acted base on emotions and the fear of losing her job, also under pressure to have plaintiff jailed to avoid this current federal action as said before. In any case plaintiff speech is protected, and/or new case law MUST take precedent here, since the speech was actually caused by the state actors. There is no case law, as to whether if a TRUE Thereat may be caused and prompt by extensive abused by the state actors towards the plaintiff. In any case ALL falls back to the state actors, since this is a civil action. Certainly, the misleading statement (in this court file) of the university police officer and the District attorney, that Plaintiff "sent several emails threatening to shoot people at Purchase College, it certainly a clue of bad faith of Mrs. DaGosto the DA's office and the police officer.

## Conclusion for this cause of action, First Amendment.

(161) The NYS aggravated harassment in the second degree (Penal Law sec. 240.30, is unconstitutionality and/or unconstitutionality as applied to plaintiff. In The People of the State of New York, v. George Morgenstern, the opinion of the court stated: "Citizen Protest of governmental policy {as plaintiff complained against SUNY discriminatory and retaliatory policies] and State action is an essential element of our democracy. We have grown strong as a free society because of words of protest -- the words of Thomas Paine and Thomas Jefferson, of Abraham Lincoln and Frederick Douglass, of Susan B. Anthony and Dr. Martin Luther King. Our Constitution has continually protected words of protest, even if they were imprudent, thoughtless, tasteless or just plain angry, so long as they were not legally obscene, or "fighting words" and did not intrude into the privacy of one's home. *(Cohen v California,* 403 U.S. 15. 20-21 [1971] [Harlan, J.].)"

(162) Defendant's   (Plaintiff   herein Mr. Morales ) wording   asserting that one day (NOT HIM as "NOT ME")   were part of part of a protest to years of discriminatory and retaliatory actions against plaintiff, and similar situated students, as set out in the criminal information, were protesting ones. He was angry. So much so that he put himself "BUT HIM"

AND NOT ME" AS EVIDEBCE THAT HE WAS NOT THE PERSON TO DO SUCH SUPPOSITION VIOLANCE THAT WA SACTULY ASSERTED BY THE ANOTHER STUDENT, AS PLAINTIFF STATED ON THE LAST PARRAGRAPH OF HIS EMAIL. CLEARLY THIS WAS AN HIPOTRATIC INSTRUCMENT USSED TO REWTAILATE AGSINT PLAINTIFF.   Cont. with **People v. George;** "Apparently [referring to defendant-George] focusing angrily on the word that was to follow. But, his words were not legally obscene or true treats (see, Cohen v California, supra, at 20-21; see also, Roth v United States, 354 U.S. 476 [1957]; citing; His words were not "fighting words". Citing; (**Chaplinsky v New Hampshire**, 315 U.S. 568 [1942].) His words did not intrude into the privacy of the complainant's home -- rather they were received in a government office." Furthermore, the court stated; "Thus, this court agrees that Mr. Morgenstern's protest was constitutionally protected. The mere fact that the receiver of this written communication found its words "annoying" or alarming is not enough to bring it within Penal Law sec. 240.30. Indeed, [the] freedom of individuals verbally to challenge [official] action [even to the point of being annoying or alarming]"

(163) the laws criminalizing "offenses to public order," (i.e. the "disturbing the peace" family of crimes such as the Town of Harrison said "causing an alarm"), need to be carefully drafted to avoid constitutional issues.   Frequently, the phrase "for no legitimate purpose" is added to these statutes, letting the courts define what constitutes a "legitimate purpose," so that constitutional issues can be avoided, especially when there   SO MANY mitigating factors as in plaintiff's   the case Plaintiff Mr. Morales . *See People v. Shack,* 86 N.Y.2d 529 (1995). Subsection One of New York Penal Law 240.30, defining Aggravated Harassment in the Second Degree, however, has some drafting issues that need to be addressed by the State Legislature. The law criminalizes any communication where someone "with intent to harass, annoy, threaten or alarm another person... communicates... by telephone, by telegraph, or by mail, or by transmitting or delivering any other form of written communication, in a manner likely to cause annoyance or alarm [as plaintiff was accused of]."   This crime is classified as a Class a Misdemeanor, meaning that it carries a sentence of up to one year in prison and/or up to a $1,000 fine.

(164) essentially, as phrased, the law criminalizes being intentionally **annoying or causing alarm,** for any purpose. This could describe any other emergency communication or warning,

such as reporting a fire or telling someone they need to go to the hospital right away; it could almost any argument over the telephone; or it could describe someone engaging in parody that is protected by the <u>First Amendment</u>. The problem with the law's phrasing has been known for decades.    Rather than throwing out the statute, however, the courts would interpret the statute as containing additional elements or limitations, and would evaluate each case to see if the statute was unconstitutional "as applied."    *People v. Dupont,* 107 A.D.2d 247, 253 (1st Dept. 1985). *People v. Smith,* 89 Misc. 2d 789 (App Term. 2d Dept. 1977).

(165) in 2003, the Court of Appeals found this statute unconstitutional. *People v. Mangano,* 100 N.Y.2d 569, 571 (2003). By that point, however, the legislature had already amended the statute, and thus <u>Mangano</u> was based on the pre-2001 version and is not necessarily binding on charges brought under the latter version.    Rather than address the Constitutional concerns, however, the 2001 amendments were mostly stylistic.    Whereas the statute previously said "communicates, or causes a communication," now it is divided into two paragraphs, one starting with "communicates," and the other starting with "causes a communication."

(166) In 2008, the U.S. District Court for the Southern District of New York found the current version of the statute unconstitutional, and found that the City of New York could be civilly liable for enforcing it.    Although the constitutional issue was not appealed, the Second Circuit sent the matter back for further submissions on whether the City had an option to enforce the law, or if it was required by the State.    The matter was settled prior to another written decision being issued. *Vives v. City of New York,* 524 F.3d 346, 357-358 (2d Cir. 2008). As applicable to DEFENDANT "THE TOWN OF HARRISON."

Following *Mangano* and *Vives,* some courts have held that this subdivision one of Penal Law 240.30 is unconstitutional and dismissed charges brought under that section, while others continue to enforce it depending upon how it is being applied. See *People v Louis,* 2011 Slip Op 21254, 927 N.Y.S.2d 592, 597 (Nassau County Dist. Ct., 2011).

(167) the overboard wording of the statue is a problem that could probably be fixed by simply adding the phrase "with no lawful purpose" to the law, but given the emerging phenomena of cyber-bullying and related issues, the legislature may want to do additional re-writing.    There are other disorderly conduct laws on the books that deal with general "threatening behavior," so it

is not as if people are permitted to run amok, but this law, if properly worded, is supposed to deal directly with threatening or harassing phone calls and similar written/electronic communications.

(168)    at this point, the State; The Harrison Court has rejected (denied Motion to Dismiss) ALL of these herein said in this section of the First Amendment, Plaintiff (defendant at the Harrison Court) requested jury trial with assigned Attorney. See exhibit #

O. Cause of Action #13; for Defendants; SUNY Binghamton University, Daniel Pearson, of the Amended Complaint.

Plaintiff incorporates and restate each and all the above legal theory as well as the FACTS section Plaintiff stated for each cause of action on his amended complaint and set forth herein. Furthermore, some defendants may have be omitted from the amended complaint in good faith and with prejudice. Further, and/since Plaintiff has exhausted ALL administrative remedies for this and ALL cause of actions herein:

(168) Plaintiff is a qualified "partially-permanent disabled" person. under the Social Security Disability Ad-ministration or SSDA, as defined by 42 U.S.C. § 12131 (2). and Section 504 of the Rehabilitation Act of 1973 29 USC sec (701-796), and under New York State workers compensation law.

(169) as related to all pending issues, Plaintiff has received and is currently receiving ADA disability accommodation at SUNY Purchase College and has been GRANTED disability accommodation according and in compliance with the ADA.   Said accommodation was granted to plaintiff in compliance with ADA rules and regulation for the summer semester of 2013, by Binghamton University.

(170) Plaintiff is NOT a current student Binghamton University; however, Plaintiff was a visiting student at said School during the summer semester of 2013.   Binghamton University—*in contradiction of its policies and in a provable retaliatory action, as stated on his original amended complaint* —had denied Plaintiff continuing visiting status at said school for the fall semester of 2013.   [Please, see case of action #12 in the amended complaint filed with this court on Aug. 26, 2013 as required by this court].

(171) In addition to Cause   ALL applicable violation of the laws stated in ALL other cause s of action herein stated in this document; Defendants' herein in this cause of action illegal and unconstitutional actions, policies, and/or intentionally misapplication of such policies, whereas Defendants, Daniel Pearson and   The State of New York,   Binghamton University,[Celia Klin, Kathleen Brunt,   Annie McCall; NOT as defendants in the amended complaint; however they are pending defendants for a new complaint regarding this cause of action contingent to the outcome of this law suit as whole] and, in direct representation of the State of New York, The State University of New York, Binghamton University and any other Joe/Jean Does NOT named herein or to be named later...**MAY** have intentionally and in premeditation, conspired to deprive Plaintiff of his; 1)equal right to education, [EDUCATION LAW] 2) not provided the services (college instructional classes), as they were contracted by Plaintiff, [Contractual law, Business law] 3) Violated Plaintiff's civil rights, by NOT providing documented disability accommodation according to American with Disability Act. [Constitutional Law]

(172) Plaintiff has been inexplicable accused of academic dishonesty during a MIDTERM test in a History class during the course of the summer 2013. Plaintiff, was *registered-visiting-student,* at BU, registered for the said class. This was an online class; *HIST 380D,* which was paid in full by plaintiff's student loan.   The said class was an upper level course taught by Professor Daniel Pearson—a defendant herein.   Furthermore, this course was Plaintiff's LAST REQUIRED upper level course for the completion of his LEGAL STUDY Major. The *HIST 380D* course was an online class. Class that may be attended form anywhere where the technology is available.   Online classes, most of the time, do not offer and/or require special accommodation for documented disabled persons (student), and the fact that I was visiting student, BU and defendant Prof. Pearson disregarded the ADA requirements of accommodation for student with documented disability.   In fact, disability department at any (defendants) SUNY does/do not automatically extend the **documented** disability accommodation and/or **notify** the professors of a disabled student; it is entirely to the student, the duty to notify and document the professor of such disability.   This protocol is NOT TRHUSFULL, since it is the ADA office of each school in charge of notify the professors of the student's disability.   This fault impression of SUNY procedures, further burdens the initiation and execution of such accommodation, since and due to the red tape common among school officials in general, and in MOST instances for the

purpose of retaliation and discrimination, as Plaintiff expenses at the SUNY system eloquently stated in this document.    In addition to any other unnecessary protocol the particular school may impose upon the disabled student, plaintiff   however, disability accommodation was effectively in place at BU at the time of this in so called plagiarizing incident. See exhibit #

(173) As plaintiff's negative experiences-- both SUNYs (Purchase and BU)--of bureaucratic and egocentric behavior towards students that do not feet the student profile, as mentioned in several causes of actions, most likely be that these students (as plaintiff) will inevitable encounter severe difficulties to have the same opportunities to education, in contrast to other students without disabilities for their academic success.    Furthermore, and for that reason, if the professor--Mr. Pearson, for example—does [did] not want to cooperate in abiding with the established accommodation may have been charged with     inconstant *"academic dishonesty?"*

(174) During the mid-semester exam, plaintiff was forced to attend/do an exam that was against his physical abilities and/or in jeopardy of his health; furthermore, in direct violation of his American with Disability Act, not excluding State and Federal violation of statutory law. Accommodation as... extended time for testing, use VOICE RECOGNITION equipment [since plaintiff's neck injuries prevent him from NORMAL typing abilities].    The exam require extensive amount of typing in a specific amount of time.    Plaintiff was never aware that there was this type of testing allowed in online classes.    Although accommodation was on file as PARTIALY-PERMANENT-DISABLED.    Professor Pearson states he did not have accommodation for plaintiff at the time of the said test. However, Professor Pearson, had the accommodation the next day, and effective two months before and concurrent since plaintiff's disability is permanent.

(175) However, Plaintiff had no choice but to do the test as best he could, making a notation on the test that he was a disabled person and that he was going to his best since he could not type...this may include cut a past from other sources.    Plaintiff indicated this in RED on the front page of the test.    Professor was also mention by plaintiff of his disability at the beginning of the class.

(176) on or about a week later, Mr. Pearson called plaintiff to his office.    On the meeting, he asked about layout of the test; plaintiff explained to the professor of his disability and inability

to type for that extent of time; further, he explained the implication of a DANGER inflammatory reaction to the stress of typing and/or hand writing.   Furthermore, plaintiff stated to the professor that he considered his actions not to be "academic dishonesty," since he did disclosed this facts on the test.

(177)   Professor Pearson then, requested proof of the disability and proper accommodation, which he received same day confirming plaintiff is a PERMANENT-PARTIALY-DISABALED STUDENT under the Social Security Disability Ad-ministration or SSDA, as defined by 42 U.S.C. § 12131 (2), and Section 504 of the Rehabilitation Act of 1973 29 USC sec (701-796), and under New York State workers compensation law. Professor applied such accommodation [time and the use of special equipment] to the remaining of the class. However, as I said before, Professor Pearson. had the accommodation documentation the next day, and effective two months before and concurrent since plaintiff's disability is permanent. At SUNY, the rule for ADDA accommodation, ALL professors MUST notified of the student disability by the time the disability accommodation is effective.

(178) However, professor Pearson   inexplicably did proceeded to allow Plaintiff to complete the class GRANT Plaintiff   disability accommodation ( more time and the use of   the use of voice recognition equipment) for the final test; even-more inexplicable is that, pprofessor Pearson proceeded to accuse of ACCADEMIC DISHONESTY.   Note: *The court should note that this is similar to cause of action #4 of the amended complaint as said before.*   It is my intention to believe that Professor Pearson did misapply the school policy. and or had not gotten the accommodation at the beginning of the class. FURTHERMORE, for purposes of this case and answer to the AAG and matter law; the interpretation of the ADA accommodation was granted at Purchase College (also a SUNY school), years before, and at BU. thus ALL. proper disability documentations were effective. It is just that many Professors have certain animosity to assist a student that does not look disabled. An unwritten policy that should never ppleide to any student that can proved said disability is current and was current at the time of the allege dishonesty. Furthermore, the suspension of two semesters is bias unusual, inappropriate. vindictive, and retaliatory in nature.   Plaintiff, will provide proof by discovery of the facts at a later time, that these actions originated by the defendants herein named were conceived in premeditation to

disqualify Plaintiff from a current application being process for his admission the spring semester 2014.

(179) UPOUN PROPER NOTIFICATION OF TREIR VIOLATIONS   ALL defendants in this cause of action,   acted with knowledge to; have [did] deprived Plaintiff and other student in similar situated situation, of federal constitutional and/or statutory rights] by failing and refusing to allow equal access to   education, in contrast to other of NORMAL (not disabled).

(180) Defendants by accusing plaintiff of plagiarism and subsequently not as required by "due process" of the law granting plaintiff with   positive appeal, have [did] acted under the state color of the law and/or as private person, on its own capacity, when deprived Plaintiff of federal constitutional and/or statutory right[s], property interest, equal right to education and otherwise discriminated against Plaintiff based upon his discriminatory and visiting status at BU. Action that otherwise would NOT have taken place to current permanent   students. situated in the same position as plaintiff was.

(181) as directed and proximate result of the violation[s] of 42 U.S.C. § 1983, and defendant action[s] illegal, actions stated on the amended complaint as the facts show and as witnesses shall testified. Plaintiff, suffered emotional injuries, but not limited to. humiliation, aches, temporary and permanent limitations on activities [study], stigma. and as part of general damages in compounding all damages in this document herein and the amended complaint, Plaintiff suffered   physical pain due to the mental stress that in term cause inflation to his spinal injuries that caused potential shortening of life mental anguish,   depress . Plaintiff also suffer preferment academic harm,   permanence financial hardship (plaintiff in debt on close to $40,000 in federal student loans, and with an   income of only an $ 860.00 per month) and lost permanent of future income as license Attorney income,   since plaintiff can no longer be able to attend *any* school.

Legal Theory.

Federal Law:

(182) as a result of defendant[s] violated provisions of the Federal and/or State statues regulations including, but not limited to, the following:

A.  The requirement of 42 U.S.C. § 1983,

B.  The requirement of titles III and V of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181, and 12203, failure to provide timely and proper ADA accommodation and § 12189; by   inaccurately weighing Plaintiff 's government disability documentation that certainly had ensure—at least temporarily—the possibility of Plaintiff's valid disability. Hence, avoiding possible aggravation of Plaintiff's injures and/or unnecessary paint and suffering, as stated by the SUNY application of ADA accommodation procedures of equal access to education.

C.  The requirement of the "Equal Protection Clause" and "due process clause" (fair right a hearing) of the Fourteenth Amendment of the US Constitution [discrimination]; as stated in letter C.Torts.

D.  The requirement of the "Commerce Clause" (right to property), of the Amendment of the US Constitution; Fifth Amendment. See part C.Torts.

E.  The requirements of Title VII of the Civil Rights Act of 1964.   Title VII prohibits discrimination based on gender and protects both women and men.   42 U.S.C. § 2000e-2(a) (1) (2000).

F.  The requirements of the Title IX of the Education Amendments of 1972 prohibits gender discrimination in education and in higher educational programs and in activities receiving federal funds. 20 U.S.C. §§ 1681-1688 (2000).

G.  The requirements of Section 3 of the Privacy Act of 1974; 5 U.S. Code § 552a - Records maintained on individuals; disclosure of medical and/or private information, with no public justified interest.20 U.S. Code § 1232g - Family educational and privacy rights, as applied to plaintiff.

H.   The requirement of 38 IDELR 73 (OCR 2002), where "adverse action "took place due to pending legal action.

**State Law:**

(183) State Education Law under NNYS Education Law; Title 1 Article 2 § 10; Legislative intent. Title 1 Article 2 "Defendants violated of Plaintiff's dignity, by conduction an evaluation conditional for admission to school, with the assertion that he was single-out for such evacuation.

A.   As required by Title 1 Article 2 § 10. Legislative intent; "The Mission.

B.   As required by Title 1 Article 2 § 12. Discrimination and harassment      prohibited.

C.   As required by Title 1 Article 2 § 13. Policies and guidelines.

D.   As required by Title 1 Article 2 Part 3 - (290 - 292)

E.   As required by Title 8 Sub Art. 3 - Professional misconduct.

<u>Tort Law.</u>

(184) all applicable Torts said above in cause of action #2, as apply to this cause of action.

(185) Ssupplemental jurisdiction.

(186)   as applied to Causes of Actions.

Standard.

(187)  As applied to Causes of Actions.

## V. Conclusion

(1) The Courts -- judicially created rules should be modified when out-of-date or unjust -- court free to amend common law. -- When a judicially created rule becomes out-of-date or unjust in its application, it is appropriate for the judiciary to modify it; the field of common law is the primary concern of the supreme court; accordingly, the court, not the legislature, should extirpate those rules of decision that are admittedly unjust, for it is to the judiciary that the power of government is given to provide protection against individual hurt; thus, as a part of the state's common-law doctrine, the supreme court has a duty to change the common law when it is no longer reflective of the economic and social needs of society. "Just as the common law is court-made law based on the circumstances and conditions of the time, so can the common law be changed by the court when conditions and circumstances change. This court and you honor have a right and a duty to develop the common law in the light of changing conditions in society, and neither the rule of stare desisis nor statutory or constitutional provisions generally preserving the force and effect of the common law bar this court and your honor from the discharge of that duty.

(2) Total abrogation, revision, or modification or change of an outdated common-law rule is within the competence of the judiciary; and indeed it is the duty of this court (respectfully) to bring the law into accordance with present-day standards of wisdom and justice, and to keep it responsive to the demands of changing. Thus, I respectfully ask the court not be bound by an early the New York State Attorneys case-laws rules unless it is supported by the constitution, reason, fairness and logic. Whenever an old rule is found unsuited to present conditions or reason, fairness and logic, it should be set aside, Instead new common-law in harmony with those conditions and meets the demands of justice", (see, 15A Am Jur 2d Common Law #13,)

(3) As a compound result of all defendants illegal retaliatory actions on all causes of actions; Plaintiff is permanently, with NO chance to attend law school; moreover, any school and more importantly, plaintiff may permanently ill due to irrational vindictive actions. Plaintiff has filed this Memorandum of Law to requesting your honor to deny the AAG Motion to Dismiss and continue to trial. In this case the "The Benefit of the Many (the students Out-weights the Benefit of the Few" (discriminatory and abusive school officials). I am just the tip of the iceberg". I,

always has said that "litigation was not what I wanted;" I just wanted to attend law school. That will not be possible, mainly because of the emotional damages caused by defendants as whole. Defendants abused of power, retaliatory action, age discrimination, gender discrimination, disability discrimination, housing discrimination, persecution, and, but not limited to intimidation, have unintentional or intentionally and/or unconsciously or premeditated ended my right to equal education, and a better future for his family as an example.

(4) I was the first (the Pioneer) of my family to arrive in the United States. I was 17 year of age 1979 when I first came to the US. I am a native country of —Chile—while was just coming out of a devastating communist regime. The main purpose of going to law school was my passion constitutional law and the civil rights of everyone. But more importantly was for to be a model for the new generation of US born of Morales. After all, the first one is the one is always remembered. All of that is gone! I wanted to pave the way for future generation of tax payers US citizen. Probability just like the AAG's great grandfather did, and just like your ancestors did too.

(5) The defendants actions against me may very well ended in different note, if inflicted to another person. I as my real meaning of my email charged with violation the NYS 240.30 code of aggregation harassment. It has been a tragedy for me and my family and friend. There is a lot of understandable anger among friend and family. This case should set an example for changes among the SUNY system; if not, these discriminatory and retaliatory actions inevitable, and one day will end in a future tragedy. How do we justify a negative result of the case then? Allowing the estate and it its employees to hide behind immunity, would mean, school officials are allow to create, promote policies that would have the sole purpose of discrimination, retaliation, punishment and abuse. That is saying" a hospital can be allowed to intentional and unjust inflict paint to a patients." However, hospitals and Doctors are saving lives, and they don't have immunity. If the US Constitution is not applicable to state actors (school officials), then why teaching in the first place? The judicial system cannot promote this action. The message to be send by the ruling of this court, must be swift and clear!

(6) Hence, I Edward Morales, hereby, respectfully, request to deny the motions to Dismiss, in ALL its respects, and Grant a summary judgment in favor of Plaintiff on the merits based on Plaintiff demands, or to allow Plaintiff continue to trails, to present with his testimony; since

witnesses are very much wanting to testify, since defendants abuses ha  takin  ce as way of polices for a very long time.

## VI. Demand for Compensatory Relief, as Stated in the A  de  mplaint.

(1) Plaintiff respectfully request the court to award damages fo  s dire  d and proximate result of the violation[s] of 42 U.S.C. § 1983, and defendant action[s] i  al. a  ns stated on the amended complaint as the facts show and as witnesses shall testified. I  intiff.  ered emotional injuries, but not limited to, humiliation, aches, temporary and permane  limita  ns on activities [study], stigma, and as part of general damages in compounding all da  es i  s document herein and the amended complaint, Plaintiff suffered physical pain due  the  l stress that in term causes inflation to his spinal injuries that caused potential shorter  g of li  ental anguish, <u>depression</u>. Plaintiff also suffer preferment academic harm, permanenc  nan  rdship (plaintiff in debt on close to $40,000 in federal student loans, and with  nco  f only an $860.00 per month) and lost permanent of future income as license Att  y in  . since plaintiff can no longer be able to attend any school.

(1) <u>Case Law</u>. As loss of enjoyment of life Rights Acts, 42 U.S  ."198  d 1983. *Patterson v. McLean Credit Union,* 491 U.S. 164, 182n. 4 (1989) (Se  n 19  *Hater v. Melon,* 502 U.S. 21, 31 (1991) (Section 1983).The 1991Civil Rights Act perm  emo  distress damages in cases brought under Title VII, the Americans with Disabili  s Act.  U.S.C.'12117(a), and the Rehabilitation Act of 1973, 29U.S.C.794(a)(  See, g  lly, 42 U.S.C.'1981A (1991. 2 U.S.C. '1981A (b)(3). humiliation or mental di  s at  *ams v. TWA,* 660F. 2d 1267 (8thCir. 1981).See also *Hammond v. Northland Coun  ng C  r,* 218 F.3d 866(8th Cir. 2000); *Ross v. Douglas County, Nebraska,* 234 F. 3d 391  hCir.  0).

(2)He U.S. Supreme Court has noted with respect to emotional  res  es that a genuine injury in this respect may be evidenced by ones conduct and  rved  thers. See, *Carey v. Pips* 435 U.S. 247, 264 n. 20 (1978). The Eighth Circuit has  that  intiff sown testimony may be adequate to support such an award and the testimon  fam  nd friends (other students) is also probative. *Lucia v. Southeast Arkansas Comm  r  Corp.,* 284 F.

3d 944, 947 (8thCir. 2002) (Plaintiff's own testimony enough); *Morse    South    Union Co.,* 174 F. 3d 917, 925(8thCir. 1999) (affirming $100,000 emotional distre    award    re family members corroborated plaintiffs testimony); *Kim v. Nash Finch Co.,*     F. 3d    5, 1065 (8thCir. 1997) ( award of $100,000 affirmed where Plaintiff, his wife    his s   tified regarding anxiety, sleepless ness, stress, depression, high blood pressu   head    and humiliation).

(3)  Expert witness shall testify as to Plaintiff evident future Fr   ional    ess Damages, see *Chintzy v. McDonnell Douglas,* 990 F. 2d1051(8thCir. 1993); *Ro   v. H   an Corp.,* 381 F. 3d 775, 783 (tier. 2004).

(4)Plaintiff prays for this court to award Punitive Damages und   the Fed   Civil Rights Statue under the 1991 Civil Rights Act, 42 U.S.C'1981; whereas the D   ndants   ntionally engaged in retaliatory and discriminatory practices with malice with re   less inc   rence to the federally protected rights of an aggrieved individual. at42 U.S.C.'1981   (b) (1)   s in punitive damages liability under 42 U.S.C."1981 and1983. See *Smith v. Wade,*    1 U.S.    56 (1983)

(6) In addition Defendants at least discriminated against Plaintiff   the E   perceived risk that its actions will violate federal law. See, *Karlstad v. American   Dental A   c.,* 527 U.S. 526 (1999), See also *Rowe v. Hussmann Corp.,* 381 F. 3d 775, 782 (8   Cir. 2   *Williams v. ConAgra Poultry* Co., 378 F. 3d 790, 796-97 (8thCir. 2004), *Baker v. John   ll & Co.,* 382 F. 3d 816, 832 (8th Cir. 2004), *Kim v. Nash Finc* (N.D. Iowa, Judge Mel   ican v. GM (E.D. Mo., Judge Carol Jackson, 199); *EEOC, et al. v. Beverly Enter*   s,   D. Mo., Judge Rodney Sippel, 2001).

## VII. Certification

I Hereby, Edward Morales (Plaintiff), certifies that he has written and revie   d the assertions and oppositions made in the petition/complaint, and in in this Memor   um of Law—but not limited--to those facts of which I (Plaintiff) have person   l knowle   . of which I am certain them to be true. As to those allegations of whom I do not h   ve direct   personal) knowledge... I rely on documentation, but not limited--provided herein and t e t   mony of witnesses and I believe them to be true.

**Respectfully,**

**Edward A. Morales**

**Plaintiff**

March 30th, 2014

--------------------------------------------------------------------------------

CC  Office of the Governor of the State of New York

Gov.   The Honorable, Andrew M Cuomo

NYS Capitol Building

Albany, NT 1224

CC  New York State Attorney General Office

Mrs. Monica Connell

120 Broadway

New York, NY 10271

*Edward Morales Vs. SUNY. et. al* CASE No 13-CV-2586 (NSR)

CC     Attorney General of the United States;

US. Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

CC     Secretary of Health and Human Services;

The US. Department of Health and Human Services

200 Independence Avenue, S.W.

Washington, D.C. 20201

CC     Secretary of Education;
               490 L'Enfant Plaza, SW, Room 2100A
Washington, DC 20202

CC     Secretary of Housing and Urban Development;

U.S. Department of Housing and Urban Development

451 7th Street S.W., Washington, DC 20410

CC     State of New York;

Office of the Attorney General

The Capitol

Albany, NY 12224-0341

CC     State University of New York;

Board of Trustees

State University Plaza

353 Broadway

Albany, New York 12246

CC     Sande Maung.

735 Anderson Hill Rd Purchase, NY 10577

(914) 251-6000

CC     Bill Junor

735 Anderson Hill Rd Purchase, NY 10577

(914) 251-6000

CC     Tori Galatro

735 Anderson Hill Rd Purchase, NY 10577

(914) 251-6000