AA6

# Appendix A

## Supporting Case Law

PRECEDENTIAL.

No. 07-2220

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

CHRISTIAN DEJOHN,

*Plaintiff-Appellee,*

v.

TEMPLE UNIVERSITY, et al.,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

**BRIEF *AMICI CURIAE* OF THE FOUNDATION FOR INDIVIDUAL
RIGHTS IN EDUCATION; THE AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA; THE CHRISTIAN LEGAL SOCIETY;
COLLEGEFREEDOM.ORG; FEMINISTS FOR FREE
EXPRESSION; THE INDIVIDUAL RIGHTS FOUNDATION;
STUDENTS FOR ACADEMIC FREEDOM; AND THE STUDENT
PRESS LAW CENTER IN SUPPORT OF APPELLEE AND FOR
AFFIRMANCE OF THE DISTRICT COURT'S DECISION**

L. Theodore Hoppe, Jr.
Shields & Hoppe LLP
223 N. Monroe Street
Media, PA 19063
(610) 892-7777

*Attorney for Amici Curiae*

Date: September 4, 2007

Samantha Harris
Foundation for Individual
  Rights in Education
601 Walnut St., Suite 510
Philadelphia, PA 19106
(215) 717-3473
*Co-counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certify that (1) none of *amici* have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in any *amici*.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT……………………………....i

TABLE OF CONTENTS……………………………………………………ii

TABLE OF AUTHORITIES……………………………………………….iv

INTEREST OF *AMICI CURIAE*………………………………………….1

SUMMARY OF ARGUMENT……………………………………………..2

ARGUMENT………………………………………………………………4

I.    Temple's Former Policy Constitutes a Speech Code
      That Impermissibly Prohibits Protected Speech Beyond
      True Harassment…………………………………………………...4

      A. The U.S. Supreme Court and the Department of Education Have
         Set Forth Clear Standards Regarding Student-on-Student
         Harassment…………………………………………………...5

      B. Temple's Sexual Harassment Policy Disregards
         These Standards and is Void for Both Vagueness and
         Overbreadth…………………………………………………7

II.   In Arguing for Reversal, Appellants Rely Solely on Cases
      Regarding High School Students, Which are Inapposite in
      This Case…………………………………………………………10

      A. There are Profound Differences in the Nature and Purpose
         of High Schools and Universities………………………..…10

      B. Temple Ignores the Critical Distinction Between High
         School and College and Seeks to Impermissibly Encroach
         upon its Students' Constitutional Rights…………………...14

III.   Unconstitutional Speech Codes Like Temple's are Part of a
       Nationwide Problem………………………………………………...16

       A. FIRE's Work Demonstrates the Pervasiveness of
          Unconstitutional Restrictions on Student Speech on
          Campus………………………………………………………….17

       B. Since the 1980s, Federal Courts have Consistently
          Invalidated College and University Harassment Policies
          as Violating the First Amendment………………………......19


CONCLUSION………………………………………………………….21

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF WORD COUNT

CERTIFICATE OF VIRUS SCAN

CERTIFICATE OF IDENTICAL BRIEFS

CERTIFICATE OF SERVICE

APPENDIX A: LIST OF PARTIES TO BRIEF *AMICI CURIAE*

# TABLE OF AUTHORITIES

Page

**Cases**

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002)........................8

*Bair v. Shippensburg University*, 280 F. Supp. 2d
357 (M.D. Pa. 2003)............................................................ ...5, 14, 19

*Beach v. University of Utah*, 726 P.2d 413 (Utah 1986).....................13

*Bethel School District v. Fraser*, 487 U.S. 675 (1986)....................10, 11

*Booher v. Board of Regents*, 1998 U.S. Dist. LEXIS
11404 (E.D. Ky. Jul. 21, 1998)...........................................…....5, 14, 20

*Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir. 1979)...........................13

*Bystrom v. Fridley High School*, 822 F.2d 747 (8th Cir. 1987)..............13

*Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Super. Ct.
Feb. 27, 1995)......................................................5, 14, 20-21

*Dambrot v. Central Michigan University*, 839 F. Supp.
477 (E.D. Mich. 1993)..................................................5, 14, 20

*Davis v. Monroe County Board of Education*, 526 U.S.
629 (1999)...........................................................…...5, 6, 7, 8, 17, 22

*Doe v. University of Michigan*, 721 F. Supp.
852 (E.D. Mich. 1989)...............................................5, 6, 14, 20

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992)................9

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)..............................9

*Harris v. Forklift Systems*, 510 U.S. 17 (1993).................................8

*Hazelwood v. Kuhlmeier,* 484 U.S. 260 (1988)...................................13

*Healy v. James,* 408 U.S. 169 (1972)..............................11-12, 13, 19

*Keyishian v. Board of Regents of the University of N.Y.,* 385 U.S. 589 (1967)...........................................................................11

*Kincaid v. Gibson,* 236 F.3d 342 (6th Cir. 2001)...........................11, 13

*Linnemeier v. Indiana University—Purdue Univ. Fort Wayne,* 155 F. Supp. 2d 1034 (N.D. Ind. 2001)..............................................11-12

*Mazart v. State,* 109 Misc. 2d 1092, 441 N.Y.S.2d 600 (N.Y. Ct. Cl. 1981)................................................................13

*Morse v. Frederick,* 127 S. Ct. 2618 (2007)...........................14, 15, 16

*Papish v. Board of Curators of the University of Missouri,* 410 U.S. 667 (1973)...........................................................................12

*Roberts v. Haragan,* 346 F. Supp. 2d 853 (N.D. Tex. 2004)..................14

*Rosenberger v. Rector & Visitors of the University of Virginia,* 515 U.S. 819 (1995)...........................................................................11

*Saxe v. State College Area School District,* 240 F.3d 200 (3rd Cir. 2001)........................................................5, 8, 22

*Sweezy v. New Hampshire,* 354 U.S. 234 (1957)................... 3, 10, 11, 12

*Texas v. Johnson,* 491 U.S. 397 (1989).......................................8-9

*The UWM Post, Inc. v. Board of Regents of the University of Wisconsin System,* 774 F. Supp. 1163 (E.D. Wis. 1991) ..........................5, 14, 20

## Statutes and Regulations

16 Pa. Stat. Ann. § 413 (2006)................................................14

Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997).................................................................................6

## Other Authorities

2002 U.S. Census Bureau Current Population Survey Report, Table A-6, "Age Distribution of College Students 14 years Old and Over, by Sex: October 1947 to 2002"............................................................12

Ashley Smith, *Student Evicted from Dorm for Posting Fliers*, Nashua Telegraph, Oct. 29, 2004.......................................................18

Debra Saunders, *S.F. State–Heckler's Paradise*, S.F. Chron., Feb. 8, 2007.....................................................................18

First Amendment: Dear Colleague, http://www.ed.gov/about/offices/list/ocr/firstamend.html ........................6-7

Frequently Asked Questions About Sexual Harassment, http://www.ed.gov/about/offices/list/ocr/qa-sexharass.html.....................7-8

John Leo, *University Presidents Battle for Honors in Spinelessness*, Universal Press Syndicate, May 1, 2006.............................................18

Matthew Daneman, *College Settles Case, Will Revise its Speech Code*, Rochester Democrat and Chronicle, May 11, 2005.............................21

Peter Applebome, *Keep 'Adam and Steve' Out of His In-Box. Is That So Hateful?*, N.Y. Times, Dec. 11, 2005.............................................18

Safe Working and Learning Environment Policy, http://www4.nau.edu/diversity/swale.asp ...........................................4

Sexual Harassment – The University of Iowa, http://sexualharassment.uiowa.edu ....................................................4

Sexual Harassment and Sexism, http://www.wmich.edu/sub/docs/policies/sexual-harassment-530.pdf ..................................................4

Terry Webster, *Citrus College Officials Settle Free-Speech Lawsuit*,
The San Gabriel Valley Tribune, Aug. 12, 2003............................21

## INTEREST OF *AMICI CURIAE*

*Amici curiae* represent a broad national coalition of groups concerned with free speech and academic freedom on America's college and university campuses. *Amici* believe that speech codes—policies prohibiting speech and expression protected by the First Amendment—dramatically abridge freedom on campus. For all the reasons stated below, *amici* believe that the District Court properly decided that appellant's former policy was unconstitutional, and that the policy, if permitted to stand, would abridge Temple students' right to free speech and contribute to the nationwide problem of censorship on campus. A complete list of *amici* is attached to this brief as Appendix A.

## SUMMARY OF ARGUMENT

The District Court properly concluded that the Temple University sexual harassment policy that existed before January 15, 2007 is unconstitutionally overbroad. If Temple's former policy were permitted to stand, it would pose a grave threat to free speech on Temple's campus, contradict decades of legal precedent invalidating campus speech codes, and exacerbate the free speech crisis on America's college campuses.

Temple University's former policy is an unconstitutional campus speech code in violation of the clear standards established by the U.S. Supreme Court and the federal Department of Education regarding what constitutes constitutionally unprotected student-on-student harassment. Like the speech codes consistently overturned by courts since the 1980s, Temple's former policy presents itself as a "harassment" policy, but its language far exceeds the scope of unprotected harassment, instead impermissibly prohibiting wide swaths of speech protected by the First Amendment.

In arguing for reversal, Temple University relies exclusively on cases regarding the free speech rights of high school students, which are inapposite in this case. High schools and colleges have profoundly different

missions, and the U.S. Supreme Court has emphasized the particular importance of free speech in the university context. Moreover, college students—unlike high school students—are overwhelmingly adults who are old enough to vote, hold public office, and serve in our nation's military. The Supreme Court has made clear that preserving a robust atmosphere for open dialogue on our nation's campuses has importance beyond even the rights of individual citizens—it is nothing less than a matter of survival for our democracy.[1]

Unfortunately, however, colleges and universities across the country are restricting students' free speech rights by maintaining policies that prohibit constitutionally protected speech. Despite numerous federal court decisions striking down such policies, most universities still maintain impermissibly restrictive speech codes, under which students are frequently punished for protected expression. Temple's former policy is one such code, and Temple's appeal must fail.

---

[1] *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (discussing the "essentiality of freedom" on campus due to universities' "vital role in a democracy").

3

# ARGUMENT

I.  **Temple's Former Policy Constitutes a Speech Code That Impermissibly Prohibits Protected Speech Beyond True Harassment**

As a public institution, Temple University is prohibited from punishing speech protected by the First Amendment. Since the 1980s, college campuses have employed overbroad harassment policies to prohibit and punish clearly protected speech. The continuing and widespread prevalence of unconstitutional speech codes masquerading as harassment policies, in spite of the fact that courts have consistently overturned such policies, is stunning.[2]

---

[2] For example, the University of Iowa provides that sexual harassment "occurs when somebody says or does something sexually related that you don't want them to say or do, regardless of who it is." Sexual Harassment – The University of Iowa, http://sexualharassment.uiowa.edu (last visited Aug. 6, 2007). Western Michigan University's Sexual Harassment and Sexism Policy prohibits "the perception and treatment of any person, not as an individual, but as a member of a category based on sex." Sexual Harassment and Sexism, http://www.wmich.edu/sub/docs/policies/sexual-harassment-530.pdf (last visited Aug. 6, 2007). At Northern Arizona University, "[p]rohibited harassment includes, but is not limited to, stereotyping, negative comments or jokes…when any of these are based upon a person's race, sex, color, national origin, religion, age, disability, veteran status, or sexual orientation." Safe Working and Learning Environment Policy, http://www4.nau.edu/diversity/swale.asp (last visited Aug. 6, 2007). That such blatantly unconstitutional policies remain in force is galling and seems to suggest a willful ignorance on the part of college administrators across the country, especially in light of the fact that many university harassment

The Temple harassment policy challenged in the instant case goes beyond prohibiting harassing speech and unconstitutionally infringes upon Temple students' First Amendment right to free expression. By drafting and maintaining this policy, Temple has ignored controlling Supreme Court precedent, the instruction of the Department of Education's Office for Civil Rights, and even the guidance supplied by this court in *Saxe v. State College Area School District*, 240 F.3d 200 (3rd Cir. 2001).

## A. The U.S. Supreme Court and the Department of Education Have Set Forth Clear Standards Regarding Student-on-Student Harassment

As this court recognized in *Saxe*[3], the Supreme Court's decision in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), sets

---

policies have been declared unconstitutional by federal courts. *See, e.g., Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) (enjoining university harassment policy); *Booher v. Bd. of Regents*, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. Jul. 21, 1998) (declaring university sexual harassment policy facially unconstitutional); *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477 (E.D. Mich. 1993) (declaring university discriminatory harassment policy facially unconstitutional); *The UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991) (declaring university racial and discriminatory harassment policy facially unconstitutional); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) (enjoining enforcement of university discriminatory harassment policy due to unconstitutionality); *Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Super. Ct. Feb. 27, 1995) (declaring university speech policies unconstitutionally overbroad under California's Leonard Law).

[3] *Saxe*, 240 F.3d at 205-06.

forth the applicable standard for establishing student-on-student harassment in the educational context. The Court held in *Davis* that: "A plaintiff must establish sexual harassment of students that is *so severe, pervasive, and objectively offensive* and that so undermines and detracts from the victims' educational experience, *that the victim-students are effectively denied equal access to an institution's resources and opportunities*." *Davis* at 651 (emphasis added). Echoing *Davis*, the Department of Education's Office for Civil Rights (OCR)—the agency responsible for the enforcement of federal anti-harassment laws on campus—has defined hostile environment sexual harassment as follows:

> Sexually harassing conduct (which can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature) by an employee, by another student, or by a third party *that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment.*

Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,038 (Mar. 13, 1997) (emphasis added).

In 2003, to address the extensive abuse of overbroad harassment regulations to ban clearly protected speech throughout higher education, the OCR issued a letter of clarification to all colleges that accept federal

funding. The letter stated that OCR's regulations "do not require or prescribe speech, conduct or harassment codes that impair the exercise of rights protected under the First Amendment." [4] The letter further made clear that "the offensiveness of a particular expression, standing alone, is not a legally sufficient basis to establish a hostile environment under the statutes enforced by OCR."

### B. Temple's Sexual Harassment Policy Disregards These Standards and is Void for Both Vagueness and Overbreadth.

Temple University's former sexual harassment policy, which contained no threshold requirement of severity or pervasiveness and which prohibited "generalized sexist remarks and behavior, not necessarily designed to elicit sexual cooperation, but that convey insulting, degrading or sexist attitudes about women and men," is unconstitutionally overbroad and vague. [5]

---

[4] First Amendment: Dear Colleague, *available at* http://www.ed.gov/about/offices/list/ocr/firstamend.html (last visited Aug. 6, 2007).

[5] Appellants assert that plaintiff's objection is to "a policy prohibiting sexual harassment as it is specifically defined by the Equal Employment Opportunity Commission," (Appellants' Br. at 28), ignoring the fact that the Supreme Court has drawn a clear distinction between harassment in the employment context (where harassment law is enforced by the EEOC) and harassment in the educational context (where harassment law is enforced by the Department of Education's Office for Civil Rights (OCR)). *See Davis*, 526 U.S. 629 (1999). OCR defines sexual harassment in the educational

"The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). That is precisely the case here: While all true sexual harassment may be "insulting, degrading or sexist," most "insulting, degrading or sexist" speech does not rise to an actionable level of harassment as defined by *Davis* and the OCR, and thus constitutes protected speech. Moreover, the former policy required no showing of severity or pervasiveness, thus conditioning the permissibility of speech on the subjective reaction of the listener.

As this court noted in *Saxe*, when it struck down a harassment policy on the grounds that it did not "require any threshold showing of severity or pervasiveness," "[t]he Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe*, 240 F.3d at 215. Indeed, the Supreme Court has clearly stated that

---

context as "when unwelcome conduct of a sexual nature is so severe, persistent, or pervasive that it affects a student's ability to participate in or benefit from an education program or activity, or creates an intimidating, threatening or abusive educational environment." *See* Frequently Asked Questions About Sexual Harassment, http://www.ed.gov/about/offices/list/ocr/qa-sexharass.html (last visited August 24, 2007). Moreover, even in the employment context, the Supreme Court has held that actionable harassment must be "severe or pervasive." *Harris v. Forklift Systems*, 510 U.S. 17, 21-22 (1993).

"[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). By regulating speech on the basis of its content, no matter how "insulting, degrading or sexist," Temple proposes to appoint itself (or complaining students) the judge of what speech shall be allowed on campus. Such a result cannot be squared with the Supreme Court's clear pronouncement, issued "time and again," that "[r]egulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 135 (1992) (citations omitted).

Temple's former policy is also impermissibly vague. To avoid vagueness, a regulation must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Under Temple's policy, no such opportunity is presented. Instead, students must guess at what the university might deem "sexist," which could potentially include core political speech such as opposition to the sports requirements of Title IX, the expression of the belief that women should stay home with their children, or the rallying cry "down with the patriarchy."

9

II.   **In Arguing for Reversal, Appellants Rely Solely on Cases Regarding High School Students, Which are Inapposite in This Case.**

**A. There are Profound Differences in the Nature and Purpose of High Schools and Universities.**

Courts have long emphasized and understood the importance of free and open expression on campus. As the U.S. Supreme Court wrote in *Sweezy v. New Hampshire*, 354 U.S. 234 (1957):

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation... Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy*, 354 U.S. at 250.

By contrast, the Supreme Court has described the mission of public secondary schools in strikingly different terms, stating:

> The role and purpose of the American public school system were well described by two historians, who stated: "[Public] education must prepare pupils for citizenship in the Republic. It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation."

*Bethel Sch. Dist. v. Fraser*, 487 U.S. 675, 681 (1986) (citations omitted).

10

The Court's substantively different conceptions of the essentiality of free speech for students at the high school and college levels is highly significant, and reflects the marked contrast in both the educational mission of each level of schooling and the maturity and ability of students at each respective stage. High school students must learn "the habits and manners of civility" to prepare for citizenship. *Id.* In contrast, college students enjoy at least as much freedom of expression as their fellow adult citizens enjoy so that they may fully participate as the "intellectual leaders" the Court describes in *Sweezy*. 354 U.S. at 250.

In the nearly fifty years since *Sweezy*, federal and state courts have repeatedly reaffirmed the special importance of robust free expression in higher education.[6] In *Healy v. James*, 408 U.S. 169 (1972), the Supreme

---

[6] *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995) ("[f]or the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses"); *Keyishian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589, 603 (1967) ("[t]he classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection'") (citations omitted); *Kincaid v. Gibson*, 236 F.3d 342 (6th Cir. 2001) ("The university environment is the quintessential 'marketplace of ideas,' which merits full, or indeed heightened, First Amendment protection"); *Linnemeier v. Ind. Univ.—Purdue Univ. Fort Wayne*, 155 F. Supp. 2d 1034, 1042 (N.D. Ind. 2001) ("A university setting

Court made clear that students are an integral part of the marketplace of ideas when it ruled that a college, acting "as the instrumentality of the State, may not restrict speech . . . simply because it finds the views expressed by any group to be abhorrent." *Healy*, 408 U.S. at 187-88. *See also Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"). The Supreme Court has never held that the nation relies on its public high schools as the engines of intellectual innovation, scientific discovery, and open debate—but in opinions like *Sweezy*, it has recognized that higher education plays precisely this role.

Another crucial distinction is that while high school students are almost exclusively minors, college students are almost exclusively adults.[7]

---

is . . . a 'hub of ideas' and a place citizens traditionally identify with creative inquiry, provocative discourse, and intellectual growth").

[7] According to the U.S. Census Bureau, only 1.2 percent of undergraduate students are below the age of 18. *See* 2002 U.S. Census Bureau Current Population Survey Report, Table A-6, "Age Distribution of College Students 14 years Old and Over, by Sex: October 1947 to 2002." The 98.8% of college students who are legal adults should not have their rights diminished because a tiny minority of their classmates are below 18. Furthermore, attendance at college is a strong indication that the 1.2% of students who are not yet legal adults nonetheless possess the maturity to be treated as such. Lastly, it is crucial to remember that an increasingly significant number of university students are substantially older than the traditional 18-22

*See Healy* at 197 (Douglas, J., concurring) ("[s]tudents—who, by reason of the Twenty-sixth Amendment, become eligible to vote when 18 years of age—are adults who are members of the college or university community"). *See also Kincaid v. Gibson*, 236 F.3d 342, 346 (6th Cir. 2001) (holding that the Supreme Court's decision in *Hazelwood v. Kuhlmeier* did not apply to the college setting because college students are "young adults"); *Bystrom v. Fridley High Sch.*, 822 F.2d 747, 750 (8th Cir. 1987) ("few college students are minors, and colleges are traditionally places of virtually unlimited free expression"); *Bradshaw v. Rawlings*, 612 F.2d 135, 139 (3d Cir. 1979) ("[c]ollege students today are no longer minors; they are now regarded as adults in almost every phase of community life"); *Beach v. Univ. of Utah*, 726 P.2d 413, 418 (Utah 1986) ("[we] do not believe that [a college student] should be viewed as fragile and in need of protection simply because she had the luxury of attending an institution of higher education"); *Mazart v. State*, 109 Misc. 2d 1092, 1102, 441 N.Y.S.2d 600, 606-607 (N.Y. Ct. Cl. 1981) ("[i]t is clear from a reading of the published cases dealing with the rights of college students that the courts uniformly regard them as young adults and not children"). Treating the First Amendment rights of high school students and university students as functionally equivalent—as appellant does in its

---

undergraduate range, and include parents, war veterans, well-established professionals, retirees, and senior citizens.

argument—spurns established jurisprudence and infantilizes college students by fundamentally confusing the unique pedagogical necessities of education at the high school and college levels.

### B. Temple Ignores the Critical Distinction Between High School and College and Seeks to Impermissibly Encroach Upon Its Students' Constitutional Rights.

Temple is asking this court to place the rights of university students—the vast majority of whom are old enough to vote, run for elected office,[8] and serve in the military—on par with the rights of schoolchildren. In arguing for the constitutionality of its policy, Temple *exclusively* cites cases relating to children in high school or younger, conveniently ignoring the string of cases in which similar policies have been struck down at colleges and universities for violating students' First Amendment rights.[9]

Temple relies heavily on the Supreme Court's recent decision in *Morse v. Frederick*, 127 S. Ct. 2618 (2007) to argue that its sexual

---

[8] Section 413 of Pennsylvania's County Code provides that "[n]o person shall be elected to any county office, except the office of district attorney otherwise provided for by this act, unless he shall be at least eighteen years of age…." 16 Pa. Stat. Ann. § 413 (2006).

[9] *See Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003); *Booher v. Bd. of Regents, Northern Kentucky Univ.*, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. Jul. 21, 1998); *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477 (E.D. Mich. 1993); *UWM Post v. Bd. of Regents of the Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989); *Corry v. Stanford*, No. 740309 (Cal. Super. Ct. 1995).

harassment policy is a legitimate restriction on the free speech rights of college students. But in *Morse*, the Supreme Court makes clear on several occasions that its decision owes in large part to the vulnerability of *children* in the school setting. The primary holding of the case, for example, is that "schools may take steps to *safeguard those entrusted to their care* from speech that can reasonably be regarded as encouraging illegal drug use." *Morse*, 127 S. Ct. at 2622 (emphasis added). The Court also reiterates its holding from an earlier case that "while *children* assuredly do not shed their constitutional rights...at the schoolhouse gate, ...the nature of those rights is what is appropriate for *children in school*." *Id.* at 2627 (emphasis added).

Moreover, in his controlling concurrence, Justice Alito makes clear that he and Justice Kennedy "join the opinion of the Court on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as 'the wisdom of the war on drugs or of legalizing marijuana for medicinal use.'" *Id.* at 2636-2637 (Alito, J., concurring). Alito also wrote that "[t]he opinion of the Court does not endorse the broad argument advanced by petitioners and the United States

that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission'"—the very argument that Temple makes for its speech code, *see* Appellants' Br. at 36. *Id.* at 2637 (Alito, J., concurring).

Thus far, the law has served to protect the collegiate marketplace of ideas from overreaching administrations, requiring policies and practices that affirm rather than compromise the First Amendment and underlying principles of academic freedom. Appellants are asking this court to take a disastrous step in the opposite direction by rendering the free speech rights of students at a public college equivalent to those of schoolchildren and giving appellants unfettered discretion to restrict any "student's speech that is inconsistent with its 'basic educational mission.'" (Appellants' Br. at 36). Leaving aside the question of whether such a standard is even appropriate for high school students, it is most certainly not appropriate in the university context.

## III.  Unconstitutional Speech Codes Like Temple's are Part of a Nationwide Problem.

The constitutional rights of Americans are fundamental and may not be diluted or restricted simply because they hinder the plans of college administrators to establish an atmosphere free of discomfort or controversy. Nor can these rights be abridged under the guise of prohibiting unlawful

conduct that is distinct from speech, such as violence or true harassment. Far too often, our nation's colleges and universities enforce unconstitutional speech codes with apparent disregard for the fact that they are violating the First Amendment. This widespread practice needs to end.

### A. FIRE's Work Demonstrates the Pervasiveness of Unconstitutional Restrictions on Student Speech on Campus.

FIRE's concern that policies such as Temple's are ripe for abuse is more than hypothetical. In the course of our work assisting students who face censorship on college and university campuses, we have learned that most universities maintain policies that prohibit speech protected by the First Amendment.

In a 2006 report, FIRE surveyed publicly available policies at the 100 "Best National Universities" and at the 50 "Best Liberal Arts Colleges," as rated in the August 29, 2005 "America's Best Colleges" issue of *U.S. News & World Report*, as well as at an additional 184 major public universities. FIRE found that 73 percent of public universities surveyed maintain policies that both clearly and substantially restrict constitutionally protected speech.[10]

---

[10] There are several narrow exceptions to the freedom of speech: speech that incites reasonable people to immediate violence; fighting words; obscenity; and libel. If a public college or university maintains policies that clearly and substantially prohibit speech beyond that which falls into the above categories or beyond the scope of actual harassment (as defined by *Davis, supra,* since the policies surveyed by FIRE most often address student-on-

In FIRE's experience, harassment policies have been the most likely to contain blatant constitutional violations. Charges of "harassment" have also been the most common means used by college administrators to censor or punish clearly protected speech. Examples abound:[11] At William Paterson University in New Jersey, a religious Muslim student was found guilty of "harassment" for stating his religious objections to homosexuality in a private response to a professor's unsolicited announcement of a university event that promoted a positive view of lesbian relationships.[12] A student at the University of Central Florida was charged with "harassment" for referring to a student government candidate as a "jerk and a fool" on the popular social networking website Facebook.com.[13] At the University of New Hampshire, a student was found guilty of harassment and evicted from his dormitory for posting fliers in his dormitory elevator joking that freshman women could lose weight by walking up the dormitory stairs.[14] Students at San Francisco State University were charged with creating a

student harassment), FIRE deems that school to clearly and substantially restrict constitutionally protected speech.

[11] Additional examples of students and faculty punished under speech codes are available at http://www.thefire.org/index.php/topic/11.

[12] *See* Peter Applebome, *Keep 'Adam and Steve' Out of His In-Box. Is That So Hateful?*, N.Y. Times, Dec. 11, 2005.

[13] *See* John Leo, *University Presidents Battle for Honors in Spinelessness*, Universal Press Syndicate, May 1, 2006.

[14] *See* Ashley Smith, *Student Evicted from Dorm for Posting Fliers*, Nashua Telegraph, Oct. 29, 2004.

"hostile environment" for hosting an anti-terrorism rally at which participants stepped on makeshift Hezbollah and Hamas flags.[15]

**B. Since the 1980s, Federal Courts have Consistently Invalidated College and University Harassment Policies as Violating the First Amendment.**

The Supreme Court has declared that "state colleges and universities are not enclaves immune from the sweep of the First Amendment," and that "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. at 180 (internal quotations omitted). In *every* case that has produced an opinion, university speech codes have failed to pass constitutional muster.

In *Bair v. Shippensburg University*, 280 F. Supp. 2d 357 (M.D. Pa. 2003), the district court enjoined Shippensburg University from enforcing a policy that, in part, prohibited "any activity, (covert or overt, that attempts to injure, harm, malign or harass), that causes the subordination, intimidation, and/or harassment of a person or group based upon race, color, creed, national origin, sex, disability or age." Like Temple in the instant case, Shippensburg argued that the policy prohibited only unlawful conduct. The

---

[15] *See* Debra Saunders, *S.F. State–Heckler's Paradise*, S.F. Chron., Feb. 8, 2007.

court disagreed, holding that the policy—along with several other challenged policies—was overbroad. *Bair*, 280 F. Supp. 2d at 372.

In *Booher v. Board of Regents*, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. Jul. 21, 1998), the district court found Northern Kentucky University's "sexual harassment policy facially invalid under the First Amendment due to vagueness and overbreadth." *Booher*, at *2. Although Northern Kentucky's policy was similar in language to EEOC harassment regulations, the court held that it did not pass constitutional muster because it "fail[ed] to draw the necessary boundary between the subjectively measured offensive conduct and objectively measured harassing conduct." *Id.* at *28. Courts around the country have reached similar decisions in other cases considering the constitutionality of university harassment policies. *See, e.g., Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) (enjoining enforcement of university discriminatory harassment policy due to unconstitutionality); *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477 (E.D. Mich. 1993) (declaring university discriminatory harassment policy facially unconstitutional); *The UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991) (declaring university racial and discriminatory harassment policy facially unconstitutional); *Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Super. Ct. Feb. 27, 1995)

(declaring university speech policies unconstitutionally overbroad under California's Leonard Law).[16]

## CONCLUSION

In arguing for reversal, Temple University asks this court to overturn not only the lower court's holding, but also established Third Circuit precedent and the regulations of the relevant federal agency; to contradict Supreme Court decisions; and to contravene decades of jurisprudence ruling campus speech codes unconstitutional.

The District Court correctly concluded that Temple's sexual harassment policy was unconstitutionally overbroad. By failing to require the necessary showing of severity and pervasiveness, and by prohibiting "generalized sexist remarks and behavior, not necessarily designed to elicit sexual cooperation, but that convey insulting, degrading or sexist attitudes about women and men,"[17] Temple, using a tactic that has been employed since the 1980s, attempted to mask an unconstitutional speech code in the guise of a harassment policy. But as a public university, Temple cannot

---

[16] Other universities have, as part of settlements, agreed to drop unconstitutional speech codes: for example, SUNY Brockport (*see* Matthew Daneman, *College Settles Case, Will Revise its Speech Code*, Rochester Democrat and Chronicle, May 11, 2005); and Citrus College (*see* Terry Webster, *Citrus College Officials Settle Free-Speech Lawsuit*, The San Gabriel Valley Tribune, Aug. 12, 2003).
[17] Pl.'s Compl., at ¶ 74.

abridge the First Amendment rights of its students by simply purporting to outlaw "harassment" so broadly construed. Rather, Temple must address true harassment—*i.e.*, behavior that meets the exacting legal standards established by the Supreme Court in *Davis*, the Third Circuit in *Saxe*, and the Department of Education—in a manner consistent with its legal and moral obligations under the First Amendment.

Further, Temple's appeal provides this court with a clear opportunity to address the continuing scandal of unconstitutional speech codes at American institutions of higher education. After twenty years of legal decisions at the state and federal level dismantling overbroad and vague speech codes[18]—each making clear that the First Amendment may not be abridged in the name of combating "harassment"—it is shameful that so many public institutions of higher education persist in maintaining unconstitutional policies like the one at issue here. Confronted with Temple's brazen attempt to overrule clear constitutional principle and established judicial precedent, this Court must not retreat in defending fundamental civil liberties on campus.

This Court should uphold the District Court's decision on appeal.

---

[18] *See* cases cited *supra* note 9.

Respectfully Submitted,

_____

L. Theodore Hoppe, Jr.
Shields & Hoppe LLP
223 N. Monroe Street
Media, PA 19063
(610) 892-7777

*Attorney for Amici Curiae*

and

Samantha Harris
Foundation for Individual Rights in
Education
601 Walnut Street, Suite 510
Philadelphia, PA 19106
(215) 717-3473

*Co-counsel for Amici Curiae*

Date: September 4, 2007

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the Bar of the United States Court of

Appeals for the Third Circuit.

_____

L. Theodore Hoppe, Jr.
Shields & Hoppe LLP
223 N. Monroe Street
Media, PA 19063
(610) 892-7777

*Attorney for Amici Curiae*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,034 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14-point Times New Roman font.

L. Theodore Hoppe, Jr.
Shields & Hoppe LLP
223 N. Monroe Street
Media, PA 19063
(610) 892-7777

*Attorney for Amici Curiae*

## CERTIFICATE OF VIRUS SCAN

*Amici* certify that a virus scan was performed on the electronic brief being filed in this matter using McAfee Antivirus software. The virus scan indicated that there were no viruses.

---

L. Theodore Hoppe, Jr.
Shields & Hoppe LLP
223 N. Monroe Street
Media, PA 19063
(610) 892-7777

*Attorney for Amici Curiae*

## CERTIFICATE OF IDENTICAL BRIEFS

Amici certify that the electronic brief filed in this matter is identical to the hard copies that are being filed.

L. Theodore Hoppe, Jr.
Shields & Hoppe LLP
223 N. Monroe Street
Media, PA 19063
(610) 892-7777

*Attorney for Amici Curiae*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 4, 2007, two copies of the foregoing Brief of *Amici Curiae* in Support of Appellee were mailed via U.S. Postal Service, first class mail, to the following:

David A. French, Esquire
Alliance Defense Fund
7141 Old Zion Road
Columbia, TN 38401

Joe H. Tucker, Jr.
Booth & Tucker, LLP
One Penn Center at Suburban
Station
1617 John F. Kennedy Blvd.,
Ste 1700
Philadelphia, PA 19103
*Attorneys for Defendants-
Appellants*

*Attorneys for Plaintiff-Appellee*

L. Theodore Hoppe, Jr.
Shields and Hoppe LLP
223 N. Monroe Street
Media, PA 19063
(610) 892-7777

*Attorney for Amici Curiae*

Dated:  9/4/07

## APPENDIX A: LIST OF PARTIES TO BRIEF *AMICI CURIAE*

The Foundation for Individual Rights in Education, Inc. ("FIRE"), is a non-profit, tax-exempt educational and civil liberties organization pursuant to section 501(c)(3) of the Internal Revenue Code, interested in promoting and protecting academic freedom and First Amendment rights at American institutions of higher education. FIRE receives hundreds of complaints each year concerning attempts by college administrators to justify punishing student expression through misinterpretations of existing law. FIRE believes that, for academic freedom and robust collegiate expression to survive, the law must remain clearly and vigorously on the side of free speech on campus.

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with nearly 600,000 members. The ACLU of Pennsylvania, one of the national ACLU's statewide affiliates, has nearly 20,000 members. For more than eighty-five years, the ACLU has sought to advance the principles of liberty and equality embodied in the Constitution of the United States and, in particular, the First Amendment. In support of these principles, the ACLU has appeared before the United States Supreme Court, this Court, and other federal Courts of Appeals in numerous First Amendment cases, both as direct counsel and as *amicus curiae*. The important free-speech issues raised in this case are of substantial concern to the ACLU and its members.

The Christian Legal Society (the Society) is a nonprofit interdenominational association of Christian attorneys, law students, judges, and law professors with chapters in nearly every state and members at most accredited law schools. The Society's legal advocacy division, the Center for Law & Religious Freedom (the Center), works for the protection of religious belief and practice, as well as for the autonomy from the government of religion and religious organizations, in state and federal courts throughout this nation. The Center strives to preserve religious freedom in order that men and women might be free to do God's will, and because the founding instrument of this Nation acknowledges as a "self-evident truth" that all persons are divinely endowed with rights that no government may abridge nor any citizen waive. Among such inalienable rights is the right of religious liberty.

Feminists for Free Expression (FFE) is a group of diverse feminists working to preserve the individual's right to see, hear and produce materials of her choice without the intervention of the state "for her own good." FFE believes freedom of expression is especially important for women's rights. While messages reflecting sexism pervade our culture in many forms, sexual and nonsexual, suppression of such material will neither reduce harm to women nor further women's goals. Censorship traditionally has been used to silence women and stifle feminist social change. It never has reduced violence. There is no feminist code about which words and images are dangerous or sexist.  Genuine feminism encourages individuals to choose for themselves. A free and vigorous marketplace of ideas is the best guarantee of democratic self-government and a feminist future.

The Individual Rights Foundation ("IRF") litigates civil rights and First Amendment issues and educates the public about the importance of the First Amendment's free speech and associational guarantees. Founded in 1993, the IRF is a nonprofit organization that represents parties to litigation and files amicus curiae briefs involving significant civil rights and First Amendment issues. The IRF is committed to the principle of equality of rights for all persons, and to the goal of protecting fundamental civil rights and First Amendment rights.

Students for Academic Freedom ("SAF") is a national coalition of independent campus groups dedicated to restoring academic freedom and educational values to America's institutions of higher learning. SAF is committed to the goal of promoting intellectual diversity at colleges and universities. SAF seeks to secure greater representation for underrepresented ideas and to promote intellectual fairness and inclusion in all aspects of the curriculum and the campus public square.

The Student Press Law Center is a national, nonprofit, non-partisan organization established in 1974 to perform legal research and provide information and advocacy for the purpose of promoting and preserving the free expression rights of student journalists. As the only national organization in the country devoted exclusively to defending the legal rights of the student press, the Center has collected information on student press cases nationwide and has submitted various *amicus* briefs, including to this Court, the Supreme Court and many other federal courts of appeal.