669 F.3d 1295 (2012)

Thomas Hayden BARNES, Plaintiff-Appellee,

v.

Ronald M. ZACCARI, individually and in his official capacity as President
of Valdosta State University, Board of Regents of the University System of
Georgia, Defendants-Appellants.

No. 10-14622.

United States Court of Appeals, Eleventh Circuit.

February 7, 2012.

1297*1297 Robert Corn-Revere, Christopher A. Fedeli, Erin Nedenia Reid, Lisa
Beth Zycherman, Davis Wright Tremaine, LLP, Washington, DC, Travis C. Barham,
Alliance Defense Fund, Lawrenceville, GA, Cary Stephen Wiggins, Cook,
Youngelson & Wiggins, Atlanta, GA, for Plaintiff-Appellee.

David C. Will, Holly Hance, Royal Washburn Will, Lawrenceville, GA, for
Defendants-Appellants.

1298*1298 Before DUBINA, Chief Judge, COX, Circuit Judge, and GOLDBERG, [*]
Judge.

COX, Circuit Judge:

In 2007, in the wake of the massacre at Virginia Tech, Ronald Zaccari, the
President of Valdosta State University at the time, "administratively
withdrew" (expelled) Thomas Hayden Barnes, a student, on the ground that
Barnes presented a "clear and present danger" to the campus. Barnes sued
Zaccari in federal court, claiming that under the Due Process Clause he was
due notice of the charges, and a hearing to answer them, prior to his removal
from campus. The district court agreed with Barnes, and denied Zaccari
summary judgment based on qualified immunity. We affirm.

In his suit, Barnes joined the Board of Regents of the University System of
Georgia as a defendant. His claim against the Board is a state-law breach
of contract claim for damages. This claim asserts that the student handbook
and contracts for student housing establish binding agreements between the
Board and university students, and that the Board breached these agreements
by failing to afford him the process due prior to his removal from campus.

The Board sought summary judgment grounded on Eleventh Amendment immunity. The district court denied the Board summary judgment, concluding that by statute Georgia has waived its immunity from suit in federal court for breach of contract. The Board appeals. We reverse.

# I. FACTS

The district court denied Zaccari's motion for summary judgment based on qualified immunity and the Board's motion for summary judgment based on Eleventh Amendment immunity. On this interlocutory appeal from that order, we view the facts in the light most favorable to the non-moving party. *Jackson v. Sauls,* 206 F. 3d 1156, 1164 (11th Cir. 2000) (citation omitted). Thus, we state the facts in the light most favorable to Barnes.

## A. BACKGROUND

In 2005, Barnes enrolled in Valdosta State University ("VSU"), a public institution in the University System of Georgia. He subsequently left VSU to attend a different school, but re-enrolled in January 2007. Barnes suffered from anxiety and agoraphobia at the time. During his first term at VSU, Barnes began meeting with a therapist at the VSU counseling center, Leah McMillan. He resumed sessions with McMillan upon returning to VSU in 2007. During the time period relevant to this appeal, Barnes was on academic probation. But he was making sufficient academic progress to remain a student at VSU.

The Board is an arm of the State of Georgia. Under the Georgia constitution, it has authority to oversee and administer the University System of Georgia. Zaccari was the president of VSU at the time in question. During his tenure, Zaccari had developed a master plan for the campus, which included constructing a new parking deck. In March 2007, the VSU student newspaper ran a story detailing the plan to build the parking deck.

1299*1299 When Barnes learned about the plans for the parking deck, he became concerned about its environmental impact and decided to oppose it. He posted a series of flyers around campus, emailed VSU officials and students about his concerns, and posted information about the project to his Facebook webpage. Zaccari saw one of Barnes's flyers and was displeased. Through a student environmental group, Zaccari identified Barnes as the source of the flyers. Because the student group expressed concerns about Zaccari's displeasure, Barnes wrote Zaccari an apology saying that he did not want his

"actions to be perceived as a personal `attack' or to jeopardize other environmental initiatives on campus." (Dkt. 179-9 at 42.)

But Barnes continued to voice his concerns. He wrote a letter to the editor of the student newspaper expressing his views. In that letter, he criticized the decision to build the parking deck as short-sighted as well as a waste of university real estate and $30 million. Barnes also learned that the Board would meet to consider approval of the parking deck on April 17. He contacted several Board members directly to voice his concerns. Barnes's messages were respectful.

When Zaccari learned that Barnes had contacted members of the Board directly, he summoned him to his office on April 16. During that meeting, Zaccari explained the reasons for building the parking deck and expressed frustration with Barnes's continued opposition. (Dkt. 190 at 114-19.) This litigation arises out of the events which unfolded following that meeting.

## B. BARNES'S ALLEGEDLY THREATENING BEHAVIOR

The particular details of Barnes's behavior are largely undisputed. But the parties dispute the inferences that can be drawn from his behavior. Thus, we characterize this behavior in the light most favorable to Barnes.

On April 16, the same day Barnes met with Zaccari, a student at Virginia Tech shot and killed thirty people. The shooting alarmed Zaccari and other officials in the University System of Georgia. Zaccari says this tragedy put him in a heightened state of alert.

Shortly after their meeting, Barnes sent Zaccari three emails. One explained Barnes's rationale for posting his flyers about the parking deck as well as his political philosophy. Another listed other universities which employ shuttle systems. The third email included a reference to cutting down the last tree on Easter Island. It characterized the inhabitant's decision to cut down that tree as making economic sense under their business plan. These emails show Barnes was passionate about environmental issues. He also admitted a willingness to resort to confrontation politics. [1] But the emails contain no overt threats and do not suggest that Barnes wanted to harm anyone.

A few days later, a letter from Barnes appeared in the in-box of one of Zaccari's staff members. It is unclear how the letter arrived. Zaccari contends the letter's arrival compromised the security of his office. (Dkt.

177-2 at 18.) In the letter, Barnes requested an exemption from the $100 fee earmarked for the parking deck's construction and offered to donate that sum to a campus environmental program. Like Barnes's emails, the letter is not threatening. Barnes had no further contact with Zaccari.

Unbeknownst to Barnes, Zaccari was monitoring his Facebook webpage. A few days before Barnes met with Zaccari, he 1300*1300 posted a satirical collage to that webpage. The collage's title read "S.A.V.E.—Zaccari Memorial Parking Garage" and included a portrait of the president. [2] Zaccari did not learn about this collage until after his meeting with Barnes. A few days after their meeting, Barnes posted several more items. These included some unrelated material, a status update saying, "Hayden Barnes is cleaning out and rearranging his room and thus, his mind, so he hopes," and a link to an article on salon.com titled "I'm mentally ill but I'm no mass murderer." (Dkt. 244 at 9-10.) The author of that article offered a reader advice about dealing with the stigma of mental illness in the wake of the tragedy at Virginia Tech. [3] Zaccari learned of these items on April 23.

## C. ZACCARI'S RESPONSE TO BARNES'S BEHAVIOR

Immediately after their April 16 meeting, Zaccari began looking for a way to remove Barnes from campus. He reviewed Barnes's academic work as a possible basis for removing him from campus. Zaccari's efforts intensified on April 20. The day before, Barnes's letter to the editor had appeared in the student newspaper, and at some point after that, Zaccari learned of Barnes's Facebook collage. Over the next two weeks, Zaccari convened no less than five meetings about Barnes. At these meetings, Zaccari characterized Barnes's behavior as threatening. [4] No one on his staff agreed with his assessment. Two mental health professionals, McMillan and the Director of the VSU counseling center, Dr. Victor Morgan, repeatedly told Zaccari that Barnes was not a threat to himself or others. [5] Other university officials agreed among themselves that Zaccari was overreacting.

During this time, Zaccari told a VSU police officer, Ann Farmer, that someone had tripped the alarm system at his house the weekend of April 13 and that he had received prank calls asking for "the business officer." Zaccari believed Barnes was responsible. Farmer suggested that Zaccari file a formal police report and get a restraining order against Barnes. He declined. After their conversation, Farmer investigated Barnes and determined he was not a threat. Barnes denies tripping the alarm and making the prank calls.

1301*1301 Zaccari explored several other avenues to remove Barnes from campus. These included a mental health withdrawal and a disorderly conduct charge. VSU's mental health withdrawal policy requires a mental health professional to recommend that the student be withdrawn because he or she represents a danger to himself or others. This policy guarantees the student an informal hearing before the withdrawal and the opportunity to present pertinent evidence on his behalf. Zaccari's staff consistently said this policy did not apply to Barnes because he was not a threat. Zaccari also looked into bringing a disorderly conduct charge against Barnes under the VSU Student Code of Conduct. But this charge also requires a hearing where the student can present evidence on his behalf. Zaccari ultimately rejected these options as too "cumbersome." (Dkt. 190-1 at 95.)

Instead, Zaccari decided that he could "administratively withdraw" Barnes under Policy 1902. This policy, which is contained in the Board's Policy Manual and applicable to all institutions in the University System of Georgia, provides:

Any student, faculty member, administrator, or employee, acting individually or in concert with others, who clearly obstructs or disrupts, or attempts to obstruct or disrupt any teaching, research, administrative, disciplinary, or public service activity, or any other activity authorized to be discharged or held on any campus of the University System is considered by the Board to have committed an act of gross irresponsibility and shall be subject to disciplinary procedures, possibly resulting in dismissal or termination of employment.

(Dkt. 179-7 at 49.) Zaccari announced his decision to "administratively withdraw" Barnes at a May 3 meeting with staff and others. He did not ask those present if he was making the right decision, and no one told him he was. Collectively though, the group agreed that Barnes should be withdrawn on May 7, a full four days later.

Zaccari also concluded that Policy 1902 did not require that he provide Barnes with prior notice of his decision or a hearing to oppose it. But his in-house lawyer Laverne Gaskins warned Zaccari, on at least three occasions, that the "administrative withdrawal" would violate Barnes's due process rights. Zaccari ignored these concerns and told Gaskins to draft a letter informing Barnes of his decision.

On May 7, the VSU police department slipped Zaccari's letter under Barnes's dorm room door. It said:

As a result of recent activities directed towards me by you, included but not limited to the attached threatening document [Barnes's Facebook collage], you are considered to present a clear and present danger to this campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from [VSU] effective May 7, 2007.

(Dkt. 190-2 at 47.) The letter conditioned Barnes's readmission on submitting two letters from mental health professionals stating he was not a danger to himself or others and that he would be receiving therapy while enrolled at VSU. The letter also informed Barnes he could appeal his withdrawal directly to the Board. Within twenty-four hours, Barnes submitted the requested letters to Zaccari, who decided they did not meet the standard for readmission. The parties dispute whether the letters actually met this standard. Barnes then appealed Zaccari's decision to the Board, which referred the matter to an administrative law judge. By December 2007, Barnes had still not received a hearing. In January 2008, after Barnes filed this lawsuit, the Board reinstated him without a hearing.

## 1302*1302 II. PROCEDURAL HISTORY

There are two claims before us on this interlocutory appeal. Count Four of Barnes's complaint alleges a 42 U.S.C. § 1983 claim against Zaccari individually. The claim asserts that Zaccari violated Barnes's procedural due process rights under the Fourteenth Amendment by failure to give him, prior to his removal from campus, due notice of the charges against him and a hearing to meet those charges. This Count seeks declaratory and injunctive relief and compensatory damages.

Count Five alleges a state-law breach of contract claim against the Board. The claim asserts that the Board's policies and provisions in the VSU student handbook, as well as contracts for student housing, establish binding agreements between the Board and VSU students. And, that the Board breached these agreements by failing to afford Barnes the procedural rights due him. This count seeks only compensatory damages.

Zaccari and the Board moved to dismiss these claims. Zaccari asserted qualified immunity and the Board asserted Eleventh Amendment immunity. The district court denied these motions. Following discovery, Zaccari and the Board moved for summary judgment, Zaccari asserting qualified immunity and the Board asserting Eleventh Amendment immunity. The district court also

denied these motions. Zaccari and the Board timely appealed. [6]

## III. ISSUES ON APPEAL

Zaccari contends the district court erred in denying him qualified immunity because: (1) he did not deprive Barnes of a constitutionally protected property interest; (2) even if he deprived Barnes of a constitutionally protected property interest, Barnes received all the process he was due; and (3) even if Barnes did not receive all the process he was due, the law was not clearly established at the time. The Board contends the district court erred in failing to dismiss Barnes's breach of contract claim as barred by the Eleventh Amendment.

## IV. STANDARD OF REVIEW

"Because qualified immunity provides the right not to be burdened by trial, and not simply a defense to liability, this Court has jurisdiction to review interlocutory appeals from orders denying summary judgment based on qualified immunity." *Hartley v. Parnell,* 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting *Tinney v. Shores,* 77 F.3d 378, 380 (11th Cir. 1996) (internal quotation marks omitted)). Similarly, we have jurisdiction under the collateral order doctrine to review the district court's order denying the Board summary judgment based on Eleventh Amendment immunity. *Summit Med. Assocs., P.C. v. Pryor,* 180 F.3d 1326, 1334 (11th Cir. 1999) (citations omitted). We review these questions of law de novo. *Hartley,* 193 F.3d at 1268; *Summit Med. Assocs.,* 180 F.3d at 1334.

## V. DISCUSSION

## A. THE DISTRICT COURT PROPERLY DENIED ZACCARI'S MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro,* 284 F.3d 1188, 1303*1303 1193-94 (11th Cir. 2002) (quoting *Thomas v. Roberts,* 261 F.3d 1160, 1170 (11th Cir. 2001) (internal quotations omitted)). To claim qualified immunity, a defendant must first show he was performing a discretionary function. *Mercado v. City of Orlando,* 407 F.3d 1152, 1156 (11th Cir. 2005) (citation omitted). The burden then shifts to the plaintiff to show that: (1) the defendant violated

a constitutional right; and (2) the right was clearly established at the time of the violation. *Id.* at 1156. Here, it is undisputed that Zaccari was performing a discretionary function.

## 1. Barnes Had a Constitutional Right to Process Before He was Removed from VSU.

To defeat qualified immunity on a motion for summary judgment, Barnes must show that, when the facts are viewed in the light most favorable to him, Zaccari violated a constitutional right. The Fourteenth Amendment guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Our inquiry into whether there was a denial of due process involves a two-part analysis. We must determine whether [Barnes] was deprived of a protected property interest, and if so, what process was due." *Woodruff v. U.S. Dep't of Labor,* 954 F.2d 634, 641 (11th Cir. 1992) (citations omitted).

"[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, property denotes a broad range of interests that are secured by existing rules or understandings." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (citation omitted) (internal quotation marks omitted). An individual can have a protected property interest in a government benefit when he has "a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The claim of entitlement must come from an independent source. *Id.* ("Property interests . . . are not created by the Constitution . . . [but] by existing rules or understandings that stem from an independent source . . . ."); *Sindermann,* 408 U.S. at 602 n. 7, 92 S.Ct. at 2700 n. 7. The independent source can be a statute, *seeGoss v. Lopez,* 419 U.S. 565, 572-73, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975); a regulation, *seeGlenn v. Newman,* 614 F.2d 467, 471-72 (5th Cir. 1980), *overruled on other grounds,Monroe Cnty., Fla. v. U.S. Dep't of Labor,* 690 F.2d 1359 (11th Cir. 1982); an express or implied contract, *seeSindermann,* 408 U.S. at 601-02, 92 S.Ct. at 2699-2700; or a mutually explicit understanding. *Id.* at 602-03, 92 S.Ct. at 2700.

"The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except `for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982); *seeBarry v. Barchi,* 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d

30 (1978); *Glenn,* 614 F.2d at 471. The independent source need not use the phrase "for cause" so long as the parties understood their agreement would have that effect. *See Peterson v. Atlanta Hous. Auth.,* 998 F.2d 904, 914 (11th Cir. 1993).

Once a state creates a substantive interest in a government benefit, "federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Memphis Light, Gas & Water Div.,* 436 U.S. at 9, 98 S.Ct. at 1560 (citation omitted) (internal quotation marks omitted); *Brown v. Ga. Dep't of Revenue,* 881 F.2d 1018, 1027 (11th Cir. 1989).

1304*1304 Zaccari contends that Barnes had no legitimate claim of entitlement to remain enrolled at VSU. But Barnes's entitlement is established by both the Board's Policy Manual and the VSU Student Code of Conduct (the "Code"). Both these documents constitute official regulations of the State of Georgia. The Georgia Constitution specifically vests control of the University System of Georgia with the Board. Ga. Const. art. VIII, § 4, para. I. Under this authority, the Board promulgated a Policy Manual. The manual includes Policy 401.01, which provides:

Admission, discipline, promotion, graduation and formulation of all rules and regulations pertaining to student institutions of the University System are matters to be handled by the institutions within the framework of regulations of the Board of Regents. Students violating rules and regulations of an institution may be punished, suspended, excluded, or expelled as may be determined by the institution.

(Dkt. 179-8 at 42.) This provision vests institutions (like VSU) with authority to make rules governing student discipline within "the framework of regulations of the Board of Regents." (*Id.*) The next sentence authorizes institutions to "punish[], suspend[], exclude[], or expel[]" those students who are "violating rules and regulations of [the] institution." (*Id.*) Policy 401.01 does not authorize institutions to punish all students—only a certain class of students, those violating the rules or regulations of the institution. By implication, then, Policy 401.01 withholds authority to discipline students who follow the rules and regulations.

Under Policy 401.01, VSU promulgated the Code. The Code similarly limits VSU's authority to discipline students to those students who have committed a violation of the Code. In the section titled "Disciplinary Sanctions," the Code lists sanctions, including suspension and expulsion, that "may be

imposed upon a student. . . *for a finding of responsibility* for violations of the Student Code of Conduct."[7] (Dkt. 179-1 at 10) (emphasis added). This provision promises VSU students they will not face disciplinary sanctions until they are found responsible for violating the Code.

Thus, the Policy Manual and the Code permit VSU to impose disciplinary sanctions[8] only "for cause." The cause at issue 1305*1305 here is a violation of the Code. Until a student violates it, that student has a legitimate claim of entitlement to continued enrollment at VSU under Georgia law. [9] Under *Logan v. Zimmerman Brush Co.*, this claim of entitlement gives Barnes a property interest in his enrollment at VSU.

Having established Barnes's entitlement under Georgia law, we next ask whether his entitlement is sufficiently important to warrant protection under the Due Process Clause. It clearly is. See*Dixon v. Ala. State Bd. of Educ., 294 F. 2d 150, 157 (5th Cir. 1961)*. Indeed, no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment. *See, e. g., Goss v. Lopez, 419 U. S. 565, 574, 576 n. 8, 95 S. Ct. 729, 736, 737 n. 8, 42 L. Ed. 2d 725 (1975)* (noting that since 1961, "the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion."); *Dixon, 294 F. 2d at 157*. Thus, we now turn to the second question: What process is due?

Fifty years ago in *Dixon v. Alabama State Board of Education,* the court said, "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." 294 F. 2d at 157. [10] Similarly, the Supreme Court held in *Goss v. Lopez* that, with a suspension of ten days, a student should receive notice and a hearing before the suspension. 419 U. S. at 581-82, 95 S. Ct. at 740 ("[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.")

VSU is a state university, and Barnes was removed for misconduct—violating Policy 1902. It is undisputed that Barnes was removed for longer than ten

days, and that he received no predeprivation process. [11] We need not decide
the details of the process due Barnes. [12] It is 1306*1306 enough to say that
*Dixon* and *Goss* establish that he was due notice of the charges and a hearing
prior to his removal. [13]

Zaccari contends he faced an emergency which required immediate action. In
*Goss,* the Court recognized that school officials can and do face emergency
situations. *Goss,* 419 U.S. at 582-83, 95 S.Ct. at 740. In an actual or
reasonably perceived emergency, predeprivation process "cannot be insisted
upon." *Id.* at 582. Instead, the process due a student in an emergency would
depend on a balancing of the different interests involved. *SeeMathews v.
Eldridge,* 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976).
But we need not determine the process due in an emergency because, when we
view the facts in the light most favorable to Barnes, no emergency existed.

Zaccari says that Barnes engaged in threatening behavior. But Barnes's
Facebook collage, emails, and letter—when viewed in the light most favorable
to him— reveal a student who is passionate about environmental issues, but
do not require an inference that Barnes intended to harm someone. Zaccari
claims that his name connected to the word "memorial" in Barnes's Facebook
collage suggests that Zaccari would soon be dead. But reasonable minds could
differ. Several university officials contemporaneously viewed the collage
and concluded it was not threatening. And the Director of the VSU Counseling
Center, Dr. Victor Morgan, told Zaccari that the collage was not a threat.

Zaccari claims he received prank calls at his home and that someone tripped
the alarm system at his house. But Barnes denies making these calls and denies
that he tripped Zaccari's alarm. Zaccari points out that he employed a
security detail to guard him at university functions and emphasizes that
others perceived him as visibly shaken. Other evidence suggests that Zaccari
was not actually afraid of Barnes. For example, Police Major Ann Farmer
suggested that Zaccari get a restraining order against Barnes, but he
declined. And after deciding to "administratively withdraw" Barnes, Zaccari
waited four days to execute his decision.

Other evidence suggests that any fear was unreasonable. Farmer investigated
Barnes, but took no action against him. Barnes's university counselor,
McMillan; his psychiatrist, Dr. Winders; and Dr. Morgan all believed that
Barnes posed no danger to himself or others. Other university officials also
concluded that Barnes was not a threat and that Zaccari was over reacting.

Zaccari emphasizes that Barnes's conduct came shortly after the shootings

at Virginia Tech. Other university officials experienced the same shock and concern generated by the tragedy at Virginia Tech, but concluded that Barnes was not a threat.

We hold that a jury could conclude that an objectively reasonable person in Zaccari's position would not have found Barnes presented a threat to safety of VSU's campus sufficient to warrant an "emergency" suspension or expulsion. We turn now to the second part of the qualified immunity analysis: Was Barnes's right to this predeprivation process clearly established at the relevant time?

## *2. Barnes's Constitutional Right Was Clearly Established in May 2007*

"The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [university president] that his conduct was unlawful in the situation he 1307*1307 confronted." *Vinyard v. Wilson,* 311 F. 3d 1340, 1350 (11th Cir. 2002) (quoting *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)). To answer this question, we look to law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia. See*Willingham v. Loughnan,* 321 F. 3d 1299, 1304 (11th Cir. 2003).

Zaccari contends that Barnes's property interest in his continued enrollment was not clearly established when he was "administratively withdrawn" in May 2007. But, at that time, Board Policy 401.01 and the Code clearly established that Zaccari could not suspend or expel Barnes without cause—i.e., Barnes violating a provision in the Code. And the Supreme Court's decisions in *Board of Regents of State Colleges v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Perry v. Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699; and *Logan v. Zimmerman Brush Co.,* 455 U.S. at 430, 102 S.Ct. at 1155, clearly established that when a government benefit "cannot be removed except `for cause,'" an individual has a property interest in that benefit protected under the Due Process Clause. *Zimmerman Brush Co.,* 455 U.S. at 430, 102 S.Ct. at 1155. Similarly, in *Winkler v. DeKalb County,* we said:

[A]lthough the primary source of property rights is state law, the state may not magically declare an interest to be "non property" after the fact for Fourteenth Amendment purposes if, for example, a longstanding pattern of practice has established an individual's entitlement to a particular governmental benefit.

648 F.2d 411, 414 (5th Cir. 1981) (quoting *Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 448 (2d Cir. 1980)*). The Code repeatedly assures VSU students that they will receive due process before being suspended or expelled. [14] Having made such assurances, Zaccari cannot reverse course and "magically declare" Barnes's entitlement to his continued enrollment is not a protected property interest under the Due Process Clause. 648 F.2d at 414.

The process due Barnes was also clearly established. In *Dixon,* the court held: "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." 294 F.2d at 158. Barnes was a student at VSU, a state university, and he was expelled for misconduct—violating Policy 1902. He received no notice or hearing before he was expelled.

The Supreme Court's decision in *Goss* further reinforces our conclusion. 419 U.S. at 581, 95 S.Ct. at 740. In that case, the Court held that a student facing a ten day suspension is entitled to some kind of process—albeit informal and summary— before the suspension is imposed. Thus, even if Zaccari could show that Barnes's "administrative withdrawal" was a suspension rather than an expulsion, Barnes's right to predeprivation process would be no less clear. [15]

1308*1308 Therefore, the decisions of this court and the Supreme Court clearly established in May 2007 that (1) Barnes had a protected property interest and that (2) he was due some predeprivation process before VSU could deprive him of that interest. Because Barnes received no predeprivation process, we affirm the district court's denial of Zaccari's motion for summary judgment grounded on qualified immunity.

However, Zaccari's qualified immunity defense does not drop out of the case. *SeeCottrell v. Caldwell, 85 F.3d 1480, 1487 (11th Cir. 1996)*. At trial, the district court can use a special verdict or written interrogatories to determine any disputed facts and the reasonable inferences drawn from those facts. *Id.* Once these issues are decided, Zaccari may reassert his qualified immunity defense in a motion for judgment as a matter of law. *Id.*

## B. THE DISTRICT COURT ERRED IN FAILING TO DISMISS BARNES'S BREACH OF CONTRACT CLAIM AGAINST THE BOARD AS BARRED BY THE ELEVENTH AMENDMENT.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. The parties agree the Board is an "arm of the state" usually entitled to Eleventh Amendment immunity. (Dkt. 1 at 29); see _Robinson v. Ga. Dep't of Transp._, 966 F.2d 637, 638 (11th Cir. 1992). But Barnes contends, and the district court ruled, that Georgia has waived its Eleventh Amendment immunity from suit in federal court for breach of contract claims. We disagree.

The test to determine if a state has waived its sovereign immunity "is a stringent one." _Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd._, 527 U.S. 666, 675, 119 S.Ct. 2219, 2226, 144 L.Ed.2d 605 (1999) (quoting _Atascadero State Hosp. v. Scanlon_, 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985)); _Edelman v. Jordan_, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974). A waiver of Eleventh Amendment immunity must specifically permit suits in federal court. _Port Auth. Trans-Hudson Corp. v. Feeney_, 495 U.S. 299, 306, 110 S.Ct. 1868, 1873, 109 L.Ed.2d 264 (1990) ("[I]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court.") (quoting _Atascadero State Hosp._, 473 U.S. at 241, 105 S.Ct. at 3146-47); _Robinson_, 966 F.2d at 640. Moreover, the Supreme Court has said that "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." _Coll. Sav. Bank_, 527 U.S. at 676, 119 S.Ct. at 2226 (citing _Smith v. Reeves_, 178 U.S. 436, 441-45, 20 S.Ct. 919, 921-23, 44 L.Ed. 1140 (1900)).

The Georgia constitution waives the state's sovereign immunity for actions _ex contractu_. Ga. Const. art. 1, § 2, para. IX(c). Similarly, the Georgia Code also waives the state's sovereign immunity for breach of contract claims. Ga. Code Ann. § 50-21-1(a). But neither provision expressly consents to suits in federal court. Absent this express consent, Georgia has not waived its Eleventh Amendment immunity from suit in federal court for breach of contract claims.

In fact, Georgia expressly retained its Eleventh Amendment immunity from such claims. Following the waiver of sovereign immunity in the Georgia constitution, a 1309*1309 separate subsection provides that: "No waiver of

sovereign immunity under this Paragraph shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers, or employees by the United States Constitution." Ga. Const. art. 1, § 2, para. IX(f). Eleventh Amendment immunity is an immunity provided by the United States Constitution. Additionally, the waiver in the Georgia Code states that "venue with respect to any [breach of contract] action shall be proper in the Superior Court of Fulton County, Georgia." Ga. Code Ann. § 50-21-1(b). Under *Smith v. Reeves,* 178 U.S. 436, 441-45, 20 S. Ct. 919, 921-23, 44 L. Ed. 1140 (1900), a state can consent to suit in its own courts without consenting to suit in federal court. And that is exactly what Georgia did when it enacted § 50-21-1.

In this case, the district court reasoned that the Board waived its Eleventh Amendment immunity because it failed to contest venue in its Fed. R. Civ. P. 12(b) motion to dismiss. This was error. "Generally, we will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a `clear declaration' that it intends to submit itself to our jurisdiction." *Fla. Prepaid,* 527 U.S. at 675-76, 119 S. Ct. at 2226 (1999) (citation omitted). Here, the Board did not invoke federal court jurisdiction. And the Board raised the Eleventh Amendment as a defense at the outset of this case in its Rule 12(b) motion.

Because Georgia has not waived its Eleventh Amendment immunity, we hold that the district court lacked jurisdiction to decide Barnes's breach of contract claim against the Board. *See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.,* 342 F.3d 1281, 1287 (11th Cir. 2003). The district court erred in granting Barnes's motion for summary judgment.

# VI. CONCLUSION

Because Barnes had a clearly established constitutional right to notice and a hearing before being removed from VSU, we affirm the district court's denial of Zaccari's motion for summary judgment based on qualified immunity, and remand for further proceedings consistent with this opinion.

Because Georgia has not waived its Eleventh Amendment immunity for breach of contract actions, we reverse the district court's denial of the Board's motion for summary judgment on Barnes's breach of contract claim, and remand with instructions to dismiss the claim against the Board for want of jurisdiction.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

[*] Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

[1] Barnes's first email referred approvingly to the mayoral administration of Dennis Kucinich and his willingness to resort to confrontation politics. (Dkt. 177-12.)

[2] The collage also included images of the proposed parking deck, a bulldozer, a globe flattened by a tire tread, an asthma inhaler, and a public bus under a red circle and slash. It included slogans such as "more smog," "bus system that might have been," and "climate change statement for President Zaccari." (Dkt. 179-9 at 51.)

[3] Specifically, the article answered a letter to its author, Cary Tennis. The letter writer states that she is mentally ill and felt stigmatized by the recent shootings at Virginia Tech. Tennis responds that the universe is cruel but there is little we can do about it. She encouraged the letter writer to live in the world as it is, to do the things she needs to do to get by, and not worry about what other people think because that is beyond her control. (Dkt. 177-30.)

The article also contained a prominent advertisement for webshots.com. The ad encouraged viewers to "Shoot it. Upload it. Get Famous." (Dkt. 177-30 at 4.) In other words, the ad asks people to upload their own videos onto the internet and potentially become famous. (Dkt. 244 at 10 n. 11.)

[4] In particular, Zaccari appeared concerned that the word "memorial" in Barnes's collage referred to his death.

[5] Additionally, after her first meeting with the president, McMillan contacted Barnes's psychiatrist, Dr. Kevin Winders, about Zaccari's concerns. Dr. Winders said that Barnes was not a threat and agreed to reassess Barnes. He conducted this evaluation and concluded Barnes was not a threat. He informed McMillan of his conclusions, but the record does not show that Zaccari learned about Dr. Winders's evaluation prior to Barnes's withdrawal.

[6] The district court has not entered final judgment in this case. We only have jurisdiction, on this interlocutory appeal, over the district court's denial of qualified immunity for Zaccari and denial of Eleventh Amendment immunity for the Board.

[7] The record is clear that Barnes was making satisfactory academic progress when he was withdrawn from campus.

[8] Zaccari contends that Barnes's administrative withdrawal was not a disciplinary sanction. We disagree. The structure and plain language of the Code compel this conclusion. The Code is divided into several sections including Appendix A (detailing the rules students must comply with) and Appendix B (setting out enforcement procedures). Appendix A is further subdivided into Academic and Non-Academic rules. The Academic section describes the procedures followed in punishing a violation of that section. However, the Non-Academic section does not set out any procedures for punishing violations of that section. Instead, the procedures to punish violations of the Non-Academic Code of Conduct are set forth in Appendix B.

The authority Zaccari cited for Barnes's administrative withdrawal—Policy 1902—is located in the Non-Academic section. This location indicates that Policy 1902 will be enforced in the same manner as all other disciplinary rules—the procedures set forth in Appendix B. Additionally, Policy 1902 specifically states that students who violate it "shall be subject to disciplinary procedures." (Dkt. 179-7 at 49.) Again, the only non-academic disciplinary procedures set out in the Code are located in Appendix B. Finally, the section in Appendix B titled "Disciplinary Sanctions" provides the following definitions:

A. Expulsion: permanent severance of the student's/organization's relationship with the University.

B. Disciplinary Suspension: a temporary severance of the student's/organization's relationship with the University for a specific period of time.

(Dkt. 179-7 at 10.) We see no substantive distinction between the "administrative withdrawal" imposed by Zaccari and the Code's definitions of "expulsion" and "disciplinary suspension." Zaccari's creative labeling cannot avoid the plain language of the Code.

[9] We do not hold that all students at state colleges and universities are entitled to continued enrollment. We hold only that one making satisfactory academic progress and obeying the rules of the school has a legitimate claim of entitlement to continued enrollment under the Board and VSU's policies.

[10] *Dixon* is binding precedent in this circuit under *Bonner v. City of*

*Prichard,* 661 F.2d 1206 (11th Cir.1981).

[11] The district court found that Barnes first learned of the charges against him on May 7, 2007, when he received Zaccari's letter withdrawing him from campus.

[12] The *Goss* court did not dictate the form that the notice and hearing should take. Instead, it recognized that the notice could be informal and that the hearing could occur only minutes after the student's misconduct. *Goss,* 419 U.S. at 582, 95 S.Ct. at 740. Following *Goss,* students have frequently challenged the adequacy of the notice and hearing. See*Nash v. Auburn Univ.,* 812 F.2d 655 (11th Cir. 1987). As this court noted in *Nash,* the adequacy of the notice and hearing will depend upon the competing interests involved. *Id.* at 660 (citation omitted).

[13] Because we conclude, for purposes of this appeal, that Barnes was due some predeprivation process, we reject Zaccari's arguments about available postdeprivation remedies.

[14] For example, in the section titled "Disciplinary Process," the Code provides that "disciplinary sanctions shall be applied only after the requirements of due process . . . have been met." (Dkt. 179-7 at 8.) The section on "Disciplinary Sanctions" lists sanctions which "may be imposed . . . *for a finding of responsibility* for violations of the [Code]." (*Id.* at 10.) (emphasis added). The only body able to make a "finding of responsibility" under the Code is a student judicial committee. At judicial committee hearings, students are guaranteed "all rights required by due process." (*Id.* at 7.)

[15] As we noted earlier, Zaccari contends that he faced an emergency situation which required immediate action. But a jury could conclude that Zaccari did not face an emergency. Therefore, we express no opinion on whether the process due in an emergency was clearly established.

4 of 5 DOCUMENTS

American Jurisprudence, Second Edition
Copyright © 2014 West Group

Barbara J. Van Arsdale, J.D., George L. Blum, J.D., John Bourdeau, J.D., Jill Gustafson, J.D., Alan J. Jacobs, J.D. and
Karl Oakes, J.D.

Civil Rights
IV. Post-Civil War Federal Civil Rights Acts
A. Civil Provisions
4. Statute Creating Right of Action for Deprivation of Federal Rights under Color of State Law (42 U.S.C.A. § 1983)
g. Defenses
(1) Immunity
(b) Immunity Available to Individuals
(iii) Qualified Immunity

15 Am Jur 2d Civil Rights § 114

§ 114 When is right "clearly established"

In determining whether a constitutional right is "clearly established," as required for a plaintiff to defeat a government official's claim of qualified immunity in a civil rights action, the relevant, dispositive inquiry is whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation he or she confronted.[81]   Otherwise stated, in determining whether a statutory or constitutional right is clearly established, the court must determine whether the contours of the right at the time of the alleged violation were sufficiently clear, in the light of preexisting law, that a reasonable person in the defendant's position would have understood that his or her conduct violated that right.[82]   This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.[83]   Thus, the unlawfulness of the alleged conduct can be established even though the very act in question had not at that time been held to be a constitutional violation.[84]   Officials can still be on notice that their conduct violates established law even in novel factual circumstances, as the salient question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional, and notice does not require that the facts of previous cases be materially or fundamentally similar to the situation in question.[85]

Observation: It has been said in this regard that the right in question must have been established in a "particularized" and relevant sense, rather than on a general level.[86]   The origin of this rule appears to be the U.S. Supreme Court case of Anderson v. Creighton, in which the Court stated that "[t]he operation of [the qualified immunity] standard...depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."[87]   The Court noted, as an example, that the right to due process of law is clearly established by the Due Process Clause, and so there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same, the Court, stated, could be said of any other constitutional or statutory violation. However, continued the Court, if the test of "clearly established law" were to be applied at this level of generality, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability, simply by alleging the violation of extremely abstract rights. The correct rule, said the Court, is that to defeat qualified immunity, the right allegedly violated must have been violated in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. The Court went on to conclude in the case at bar that although the defendant, an FBI agent, had taken part in a warrantless search of the plaintiffs' home on the basis of belief that a suspected bank robber might have been there, the mere fact that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment did not defeat the agent's claim of qualified immunity. Rather, said the Court, the agent would be entitled to qualified immunity if he could reasonably have believed that the circumstances surrounding the search constituted probable cause and exigent circumstances rendering the warrantless search lawful. Anderson was a Bivens action brought under the Fourth Amendment rather than under 42

15 Am Jur 2d Civil Rights § 114

U.S.C.A. § 1983. However, the Court has noted that there is no distinction between immunity law relating to Bivens actions and that relating to § 1983 actions.[68]

**FOOTNOTES:**

n1  Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

n2  Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 104 Ed. Law Rep. 106 (1st Cir. 1995); Baird v. Renbarger, 576 F.3d 340 (7th Cir. 2009); P.B. v. Koch, 96 F.3d 1298, 112 Ed. Law Rep. 687 (9th Cir. 1996); Shepard v. Peryam, 657 F. Supp. 2d 1331 (S.D. Fla. 2009); Reno v. East Baton Rouge Parish School Bd., 697 F. Supp. 2d 659, 257 Ed. Law Rep. 954 (M.D. La. 2010); Plummer v. Town of Somerset, 601 F. Supp. 2d 358 (D. Mass. 2009); Campbell v. City of Springboro, Ohio, 2011 WL 1575525 (S.D. Ohio 2011).

To the extent, as alleged by a black defendant erroneously convicted of rape and wrongfully incarcerated for two decades, that a laboratory technician who compared antigens found in defendant's blood with those present in a mixture of blood and semen recovered from the rape victim's underwear had deliberately or knowingly created a misleading and scientifically inaccurate serology report in violation of defendant's due process rights, the laboratory technician was not entitled to qualified immunity for his actions; a reasonable laboratory technician in 1984 would have understood that such actions violated due process. Brown v. Miller, 519 F.3d 231 (5th Cir. 2008).

Police officers' decision to arrest antiwar protesters, clothed only in thong underwear and forming a pyramid to recreate a notorious war prisoner abuse scandal, was not incompetent, was not a willful violation of law, and even if mistaken, was a reasonable mistake in a tense, uncertain, and rapidly evolving context, and thus, the officers were entitled to qualified immunity from the protesters' claims that the arrests violated their First and Fourth Amendment rights, since such rights, even if violated, were not clearly established so as to make clear to a reasonable officer that his conduct was unlawful in a situation requiring split-second judgments in confusing circumstances. Egolf v. Witmer, 526 F.3d 104 (3d Cir. 2008).

Personnel of Puerto Rico Aqueduct and Sewer Authority were not entitled to qualified immunity to a public employee's political affiliation civil rights claim under the First Amendment, alleging that she was demoted and passed over for a position because of her affiliation with a particular political party, where the employee had a right under the First Amendment to be free from discrimination on the basis of political opinions or beliefs, that right was clearly established at the time of the alleged violation, and a reasonable officer would have understood that the actions taken against the employee were contrary to her protected First Amendment rights. Rosario Rivera v. Aqueduct and Sewer Authority of Puerto Rico, 472 F. Supp. 2d 165 (D.P.R. 2007).

n3  Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

The facts of the case at bar need not precisely mirror the facts of a precedent-setting case in order to defeat a claim of qualified immunity. Yvonne L., By and Through Lewis v. New Mexico Dept. of Human Services, 959 F.2d 883 (10th Cir. 1992).

The law regarding strip searches of students at school was not clearly established to the extent that school officials should have known at the time that their conduct in strip searching a 13-year old middle school student in an attempt to find contraband prescription-strength pain reliever drugs was unreasonable under the Fourth Amendment, and therefore the officials were entitled to qualified immunity from section 1983 liability. Safford Unified School Dist. No. 1 v. Redding, 129 S. Ct. 2633, 174 L. Ed. 2d 354, 245 Ed. Law Rep. 626 (2009).

A principal and a school resource officer were entitled to qualified immunity in an action by parents of a student who was killed with a gun he took to school alleging that their failure to remove the gun from the school campus violated the student's substantive and procedural due process rights; the parents presented no binding law that declared similar conduct in similar circumstances to be a violation of law such that a reasonable official would have understood that what he or she was doing violated a constitutional right. Niziol v. Pasco County Dist. School Bd., 240 F. Supp. 2d 1194, 174 Ed. Law Rep. 208 (M.D. Fla. 2002).

Relevant decisional law, see § 115.

n4  Hale v. Townley, 45 F.3d 914 (5th Cir. 1995).

n5  Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

n6  Zepp v. Rehrmann, 79 F.3d 381 (4th Cir. 1996); Stefanoff v. Hays County, Tex., 154 F.3d 523 (5th Cir. 1998); Roe v. Elyea, 631 F.3d 843, 78 Fed. R. Serv. 3d 874 (7th Cir. 2011); Newell v. Sauser, 79 F.3d 115 (9th Cir. 1996); Dotson v. City of Youngstown, Ohio, 76 F. Supp. 2d 810 (N.D. Ohio 1999); Campbell v. City of Springboro, Ohio, 2011 WL 1575525 (S.D. Ohio 2011); El Dia, Inc. v. Rossello, 20 F. Supp. 2d 296 (D.P.R. 1998), aff'd, 165 F.3d 106 (1st Cir. 1999); Estate of Brown v. Barian, 43 F. Supp. 2d 1008 (E.D. Wis. 1999); Penterman v. Wisconsin Elec. Power Co., 211 Wis. 2d 458, 565 N.W.2d 521 (1997).

n7  Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

15 Am Jur 2d Civil Rights § 114

n8   Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

**SUPPLEMENT:**

**Cases**

A case directly on point is not required, for the court to conclude that the law was clearly established, so that a government official is not entitled to qualified immunity from civil damages, but existing precedent must have placed the statutory or constitutional question beyond debate. Stanton v. Sims, 134 S. Ct. 3 (2013).

For a statutory or constitutional right to be "clearly established," so that a government official lacks qualified immunity from civil damages liability for violating that right because the right was clearly established at the time of the challenged conduct, the right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right; in other words, existing precedent must have placed the statutory or constitutional question beyond debate. Reichle v. Howards, 132 S. Ct. 2088 (2012).

Under the "clearly established" standard for qualified immunity, which shields government officials from civil damages liability for violating a constitutional right unless the right was clearly established at the time of the challenged conduct, the right allegedly violated must be established not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official. Reichle v. Howards, 132 S. Ct. 2088 (2012).

The right to be free from arrest without probable cause was clearly established at the time of suspect's arrest, for purpose of determining whether arresting officers were entitled to qualified immunity in suspect's § 1983 action alleging false arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983. Gonzalez v. City of Schenectady, 728 F.3d 149 (2d Cir. 2013).

County sheriff's deputies were entitled to qualified immunity from § 1983 claim brought by estate of arrestee who was shot and killed by deputies, alleging that deputies unconstitutionally sought to disarm "lawfully armed citizen," in violation of arrestee's Second Amendment right to bear arms; right asserted was not clearly established at time of shooting. U.S.C.A. Const.Amend. 2; 42 U.S.C.A. § 1983. Estate of Hickman v. Moore, 502 Fed. Appx. 459 (6th Cir. 2012).

City police officer was entitled to qualified immunity from deaf apartment occupant's § 1983 excessive force claim arising from officer's deploying stun gun second time in dart mode to subdue occupant; law regarding second application of stun gun, after first application that was objectively reasonable, was not clearly established at time of incident. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983. De Contreras v. City of Rialto, 894 F. Supp. 2d 1238 (C.D. Cal. 2012).

For the law which a public official claiming qualified immunity allegedly violated to be "clearly established," case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the official's place, that what he is doing violates federal law. White v. City of Lagrange, Ga., 952 F. Supp. 2d 1353 (N.D. Ga. 2013), aff'd, 2013 WL 5912529 (11th Cir. 2013).

Ultimate question in determining whether law is "clearly established," for qualified immunity purposes in § 1983 action, is whether governmental official had "fair warning" that his conduct violated plaintiff's constitutional right. 42 U.S.C.A. § 1983. Ritchie v. Coldwater Community Schools, 947 F. Supp. 2d 791 (W.D. Mich. 2013).

Rights may be clearly established, for qualified immunity purposes in § 1983 action, even though precise conduct at issue has not yet been declared unlawful. 42 U.S.C.A. § 1983. Bryan v. Erie County Office of Children & Youth, 861 F. Supp. 2d 553 (W.D. Pa. 2012).

Whether a constitutional right is clearly established, as required to avoid qualified immunity under section 1983, turns on whether the case law at the time of the alleged constitutional violation makes it sufficiently clear that every reasonable official would know his conduct violates that right. 42 U.S.C.A. § 1983. Mendoza v. City of West Covina,

206 Cal. App. 4th 702, 141 Cal. Rptr. 3d 553 (2d Dist. 2012).

**REFERENCE:** West's Key Number Digest, Abatement and Revival [westkey]52, 57, 72(2)
West's Key Number Digest, Actions [westkey]3
West's Key Number Digest, Appeal and Error [westkey]73, 93
West's Key Number Digest, Civil Rights [westkey]1003, 1004
West's Key Number Digest, Civil Rights [westkey]1003, 1004, 1009, 1027 to 1029, 1031 to 1033(2), 1039, 1041, 1071, 1088(5), 1301, 1303, 1304, 1307 to 1313, 1315, 1316, 1318, 1319, 1321, 1324 to 1327, 1329 to 1332(6), 1333, 1333(3), 1335, 1336, 1338 to 1341, 1343, 1344, 1348, 1352, 1354, 1355, 1360, 1362, 1364, 1366 to 1371, 1373 to 1384, 1391, 1393 to 1396, 1398, 1401, 1403, 1407, 1409, 1411, 1417, 1419, 1424, 1426 to 1432, 1448 to 1474(2), 1476, 1478 to 1480, 1482, 1484, 1487, 1803 to 1806, 1808, 1809
West's Key Number Digest, Conspiracy [westkey]2, 7.5(1) to 7.5(3), 13, 29.5(1), 29.5(2), 47(3.1), 74.50
West's Key Number Digest, Courts [westkey]489(1), 508(2.1), 508(7)
West's Key Number Digest, Criminal Law [westkey]40
West's Key Number Digest, Federal Courts [westkey]13.10, 14.1, 48, 74, 182, 219.1 to 223, 225, 411, 420, 428, 579, 770
West's Key Number Digest, Judgment [westkey]828.4(1), 828.4(2), 828.15(1)
West's Key Number Digest, Jury [westkey]14(1.5)
West's Key Number Digest, Limitation of Actions [westkey]58(1)
A.L.R. Index, Abstention Doctrine
A.L.R. Index, Associations and Clubs
A.L.R. Index, Attorney's Fees
A.L.R. Index, Civil Rights and Discrimination
A.L.R. Index, Civil Rights Attorney's Fees Awards Act
A.L.R. Index, Civil Rights Organizations
A.L.R. Index, Class Actions
A.L.R. Index, Conspiracy
A.L.R. Index, Constitutional Law
A.L.R. Index, Due Process
A.L.R. Index, Equal Protection of Law
A.L.R. Index, Exhaustion of Remedies
A.L.R. Index, Fair Housing Act
A.L.R. Index, Freedom of Association
A.L.R. Index, Good Faith
A.L.R. Index, Government Immunity or Privilege
A.L.R. Index, Housing and Slum Clearance
A.L.R. Index, Housing Authority
A.L.R. Index, Laches and Delay
A.L.R. Index, Property
A.L.R. Index, Public Accommodations
A.L.R. Index, Public Housing
A.L.R. Index, Religion and Religious Societies
A.L.R. Index, Segregation
A.L.R. Index, Sex Discrimination
A.L.R. Index, State Action
West's A.L.R. Digest, Abatement and Revival [westkey]52, 57, 72(2)
West's A.L.R. Digest, Civil Rights [westkey]1003, 1004, 1009, 1027 to 1029, 1031 to 1033(2), 1039, 1041, 1071, 1088(5), 1301, 1303, 1304, 1307 to 1313, 1315, 1316, 1318, 1319, 1321, 1324 to 1327, 1329 to 1332(6), 1333, 1333(3), 1335, 1336, 1338 to 1341, 1343, 1344, 1348, 1352, 1354, 1355, 1360, 1362, 1364, 1366 to 1371, 1373 to 1384, 1391, 1393 to 1396, 1398, 1401, 1403, 1407, 1409, 1411, 1417, 1419, 1424, 1426 to 1432, 1448 to 1474(2), 1476, 1478 to 1480, 1482, 1484, 1487, 1803 to 1806, 1808, 1809
West's A.L.R. Digest, Conspiracy [westkey]2, 7.5(1) to 7.5(3), 13, 29.5(1), 29.5(2), 47(3.1), 74.50
West's A.L.R. Digest, Federal Courts [westkey]13.10, 14.1, 48, 74, 182, 219.1 to 223, 225, 411, 420, 428, 579, 770
West's A.L.R. Digest, Judgment [westkey]828.4(1), 828.4(2), 828.15(1)
West's A.L.R. Digest, Jury [westkey]14(1.5)

Case 7:13-cv-02586-NSR   Document 37-6   Filed 04/17/14   Page 23 of 23

Page

15 Am Jur 2d Civil Rights § 114

West's A.L.R. Digest, Limitation of Actions [westkey]58(1)
Federal Procedure, L. Ed. §§ 11:173 to 11:232, 11:254 to 11:386
Proof of Housing Discrimination Against a Prospective Tenant on Account of Race or National Origin, 93 Am. Jur.
Proof of Facts 3d 415
Zoning: Proof of Wrongful Land Use Regulation Pursuant to Section 1983, 30 Am. Jur. Proof of Facts 3d 503
Proof of Unconstitutional Prison Conditions, 24 Am. Jur. Proof of Facts 3d 467
Discrimination on the Basis of Handicap Under the Fair Housing Act, 23 Am. Jur. Proof of Facts 3d 499
Termination or Demotion of a Public Employee in **Retaliation** for Speaking Out as a Violation of Right of Free Speech,
22 Am. Jur. Proof of Facts 3d 203
Excessive Force by Police Officer, 21 Am. Jur. Proof of Facts 3d 685
Police Misconduct as Municipal Policy or Custom, 13 Am. Jur. Proof of Facts 3d 1
Invasion of Privacy by False Light Publicity, 6 Am. Jur. Proof of Facts 3d 585
Governmental Entity's Liability for Injuries Inflicted on Prisoner in Assault by Fellow Prisoner, 33 Am. Jur. Proof of
Facts 2d 303
Racial Discrimination in Sale of Real Estate, 14 Am. Jur. Proof of Facts 2d 511
Discrimination in Jury Selection -- Systematic Exclusion or Underrepresentation of Identifiable Group, 9 Am. Jur. Proof
of Facts 2d 407
Asserting Claims of Unconstitutional Prison Conditions under 42 U.S.C.A. §§ 1983, 64 Am. Jur. Trials 425
Obtaining Damages in Federal Court for State and Local Police Misconduct, 62 Am. Jur. Trials 547
Defense of a Police Misconduct Suit, 38 Am. Jur. Trials 493
Housing Discrimination Litigation, 28 Am. Jur. Trials 1
Prisoners' Rights Litigation, 22 Am. Jur. Trials 1
Handling the Defense in a Conspiracy Prosecution, 20 Am. Jur. Trials 351
Police Misconduct Litigation -- Plaintiff's Remedies, 15 Am. Jur. Trials 555
Cause of Action Against Public Accommodation By Individual With Disability For Denial of Full and Equal Enjoyment
of, or Participation in, Recreation or Exercise Because of Alleged Threat to Health or Safety of Others, 12 Causes of
Action 99
Am. Jur. Pleading and Practice Forms, Civil Rights §§ 3, 5 to 18.11, 21, 22, 25, 26
Am. Jur. Pleading and Practice Forms, Public Officers and Employees § 58
Federal Procedural Forms §§ 39:130, 39:131, 39:146, 39:228
West's Key Number Digest, Civil Rights [westkey]1373 to 1376